## RICHMOND CEDAR WORKS v. PINNIX et al.

### (District Court, E. D. North Carolina. October 1, 1913.)

1. EVIDENCE (§ 343*)—DEEDS—CERTIFIED COPY OF RECORD OF ANCIENT DEED—PRESUMPTIONS.

For many years the statutes of North Carolina have required deeds acknowledged before a commissioner appointed for the state in other states to be probated for registry before a court or judge or clerk of a court in the county where the land lies, to entitle them to be recorded, but none of such statutes require the certificate of such probate to be registered. Revisal N. C. 1905, § 1599, entitles a duly certified copy of any deed or writing, required or allowed to be registered, to be used as original evidence, but does not require that such certified copy shall include the certificate of probate. *Held*, that where a certified copy of a deed showed it to have been registered in the county where the land lies more than 40 years before, it would be presumed that it had been duly admitted to probate, and that such copy was admissible in evidence.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 1315–1330; Dec. Dig. § 343.*]

2. AFFIDAVITS (§ 2*) — REGISTRATION OF ANCIENT DEEDS — NORTH CAROLINA STATUTE—AFFIDAVIT BY OFFICER OF CORPORATION.

Under Revisal N. C. 1905, § 981, which provides that "any person holding any unregistered deed or claiming title thereunder, executed prior to January 1, 1870, may have the same registered without proof of the execution thereof, provided that such person make an affidavit * * * that the grantor * * * of such deed, and the witnesses thereto, are dead or cannot be found and that he cannot make proof of their handwriting, and * * * provided that * * * affiant believes such deed to be a bona fide deed and executed by the grantor therein named," where a corporation is the holder of such a deed, the affidavit may properly be made by its president.

[Ed. Note.—For other cases, see Affidavits, Cent. Dig. §§ 5–15; Dec. Dig. § 2.*]

3. JOINT-STOCK COMPANIES (§ 14*)—DEEDS—VALIDITY—CAPACITY OF PARTIES TO CONVEY.

A deed, executed by a limited partnership association formed under the laws of a state and also by the individual members and stockholders of the association, is sufficient to convey title to its lands.

[Ed. Note.—For other cases, see Joint-Stock Companies, Cent. Dig. § 15; Dec. Dig. § 14.*]

4. ADVERSE POSSESSION (§ 85*)—SUFFICIENCY OF POSSESSION—COLOR OF TITLE.

The record owner of a tract of land granted by the state in 1788 died in 1832. No conveyance from him or his heirs was shown, but in 1842 a deed to the land was executed by a third person, reciting that it was the land purchased at a sale by the estate of the deceased owner. It also reserved to the grantor the right to remove certain timber cut by him. Successive conveyances containing similar recitals were made and recorded prior to 1860, and through them complainant deraigned title. There was also a public sale under a mortgage made by one of the grantees in 1845. The land was swamp, uninclosed, and valuable only for its timber. There was evidence to support findings by the master that complainant and its predecessors had, from time to time, cut timber from the land quite extensively, sometimes for several years in succession, and that they had paid the taxes thereon for 40 years. *Held*, that they had such color of title and such possession as to give complainant title by adverse possession under the state statute, as against the heirs of the former

owner, who had exercised no possession and made no claim for more than 60 years.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 313, 498–503, 656, 657, 660, 668, 688–690; Dec. Dig. § 85.*]

5. QUIETING TITLE (§ 15*)—SUIT—DEFENSES.

Allegations of certain defendants in a suit to quiet title that a code-fendant joined as a tenant in common with them was not a bona fide owner, but purchased his interest in collusion with complainant and in its interest, *held* not to constitute a defense, since, even if proved, under the facts shown the rights of the other defendants were in no manner prejudiced.

[Ed. Note.—For other cases, see Quieting Title, Cent. Dig. § 47; Dec. Dig. § 15.*]

6. EQUITY (§ 377*)—HEARING—SUBMISSION OF ISSUES TO JURY.

Where, in a suit to quiet title, a large amount of testimony has been taken at great expense in time and cost on the question of possession, and the master has made and reported his findings thereon, exceptions to which have been taken and argued to the court, an issue will not be thereafter framed on the question for submission to a jury.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 788–793; Dec. Dig. § 377.*]

7. ADVERSE POSSESSION (§ 13*)—NATURE AND REQUISITES.

Laches of the owner is the ground on which title is acquired by adverse possession. The owner sees his boundaries invaded by an adverse claimant, asserting title, and if then he remains passive long enough, he is held to acquiesce in the adverse claim; hence the possession must be open, notorious, and under claim of right in order to enable the owner to be informed of the invasion of his rights so that he may assert and enforce them.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 65, 67–76; Dec. Dig. § 13.*

For other definitions, see Words and Phrases, vol. 1, pp. 227–235; vol. 8, p. 7568.]

In Equity. Suit by the Richmond Cedar Works against one Pinnix and others. Decree for complainant.

Bill in equity, brought by plaintiff, to remove cloud from and quiet title. The land in controversy is situate in the Eastern district of North Carolina, being a portion of the Dismal Swamp, of the value of $60,000. Plaintiff alleges that it is the owner and in possession of the locus in quo; that defendants assert an adverse interest in said land, under deeds and other paper writings, which are a cloud upon its title. Plaintiff is a Virginia corporation; defendants, Pinnix and Ferrebee, are citizens and residents of the Eastern district of North Carolina; defendant Gregory was, at the time of filing the bill, a citizen and resident of Mississippi. The equitable jurisdiction is invoked under the provisions of section 1589, Revisal N. C. 1905. Holland v. Challen, 110 U. S. 15, 3 Sup. Ct. 495, 28 L. Ed. 52. Defendants deny that plaintiff is the owner of the land in controversy, or that it is in possession thereof; they aver that they are the owners as tenants in common. By consent an order of reference was made to Hon. J. B. Leigh, special master, to hear the evidence and report his findings of fact and conclusions of law. Upon the coming in of the report, the defendants filed exceptions thereto, and the cause was set down for hearing.

R. W. Winston, of Raleigh, N. C., for plaintiff.

E. F. Aydlett and J. Kenyon Wilson, of Elizabeth City, N. C., for defendants Pinnix and Ferrebee.

J. C. B. Ehringhaus, of Elizabeth City, N. C., for defendant Gregory.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

CONNOR, District Judge (after stating the facts as above). [1] Defendants' first exception is directed to the admission in evidence of a certified copy of a deed from John R. White and his wife to George T. Wallace, dated April 10, 1857; registered in Book C. C., page 542, Camden county, January 24, 1871. There is, upon the certified copy, a certificate of acknowledgment by the grantor and his wife, purporting to have been made by W. J. Baker, a commissioner of affidavits, in Virginia, for North Carolina, dated April 11, 1857. There is, on the copy of the deed, no order of registration, by the court of pleas and quarter sessions of Camden county, N. C. It is offered and admitted as color of title. If plaintiff had offered and proved the execution of the original deed, and showed that it, or those under whom it claimed, entered upon and remained in possession of the land, claiming under the deed, it would be admissible for the purpose of showing the character of the entry and extent of the possession, without registration. When relied upon as title, it must be acknowledged by the grantor, or his signature proven on oath, by one or more witnesses, in the manner prescribed by law, and when so acknowledged or proven and "registered according to law shall be valid, and pass title and estates without livery of seisin, attornment or other ceremony whatever." Revisal, § 979. This provision is found in our statutes as early as Laws 1715, c. 7. A number of statutes have been enacted providing for the probate of deeds, conveying land in this state, by grantors residing in other states of the Union and in foreign countries. These acts were collected, brought into orderly arrangement, and codified by Mr. Samuel F. Mordecai, dean of the Trinity Law School, with his uniform accuracy. Pub. Laws, 1899, c. 235; Pell's Rev. c. 18, §§ 952–956. For subsequent amendments see Supplement, 1911. Curative statutes have been enacted at every session of the General Assembly. None of them include the deed in controversy. At the session of 1830, the Governor was authorized to appoint commissioners of affidavits in the several states and territories, who were given power to take the acknowledgment or proof of deeds conveying lands lying within this state. It is provided that:

"Any such acknowledgment or proof, taken or made in the manner directed by the laws of this state, and certified by the commissioner before whom the same shall be taken or made, shall have the same force and effect and be as good and available in law for all purposes, as if the same had been made or taken before one of the Justices of the Supreme Court of the United States, or judge of any court of supreme jurisdiction in any of the United States." Acts 1830–31, c. 31; R. S. c. 21.

By section 4 of the statute the Governor is directed to make known to the clerks of the several courts of record of the state the name and places of residence of such Commissioners. By section 5, c. 37, R. S., and of the Revised Code, it is provided that, when a deed is proven before any of the several officers named therein, outside of this state, including "any commissioner appointed by the Governor of this state according to law," and certified by him as required by law, such deed—

"being exhibited in the court of pleas and quarter sessions of the county in which such lands lie. * * * or to one of the Judges of the Supreme Court or of the superior courts of this state, shall be ordered to be registered with

the certificate thereto annexed, and such deeds, * * * with the certificates thereto annexed having been registered, pursuant to such order, in the county, in which such lands lie, * * * shall be valid in law to convey," etc.

This statute was in force in 1857, when the deed from White to Wallace purports to have been executed. It will be noted that the statute does not require that the certificate of the clerk of the court or the judge who orders the deed and the certificate of the commissioner to registration shall be made upon or attached to the deed or registered with it. It may be asked, what evidence would the register of deeds have that a deed tendered him for registration upon a probate taken by a commissioner had been passed upon by the court? By reference to chapter 98, R. S. (Id. Rev. Code, entitled "Registers") being the act of 1777, as amended by the Acts of 1807 and 1814, it will be seen that by section 5 it is made the duty of the clerks of the court of pleas and quarter sessions, upon application of the register of deeds for his county, at any time after 10 days from the rise of each court, to deliver to the said register all deeds and other instruments of writing admitted to probate and then remaining in his office for registration, and to pay over the fees for registering the same. For failure to discharge the duty so imposed, the clerk shall forfeit and pay to the register the sum of $100. By section 6 it is made the duty of the register, within 20 days after the rising of each court, to apply at the clerk's office of their respective counties for all deeds admitted to probate for registration. For failure to do so the register forfeited the sum of $10, one half to the use of the poor, and the other half to the use of the person suing for the same. The register, therefore, was authorized, and it was made his duty, to accept from the clerk such deeds as were given him for registration, as having been duly admitted to probate in open court. There was no statutory requirement that the clerk write any certificate on the deed, and none that such certificate, if written on it, be recorded. The fact of its probate and order of registration was entered on the minutes of the court. Freeman v. Hatley, 48 N. C. 115; Perry v. Bragg, 111 N. C. 163, 16 S. E. 10. The abolition of the court of pleas and quarter sessions, resulting in conferring upon clerks of the superior court and other officers probate jurisdiction, resulted in important changes in the method pursued in probating deeds. This is shown by the provision of section 1246, Code 1883, requiring the clerk of the superior court, taking probate of a deed, to "enter his certificate thereon." By section 1250, the power is conferred upon the clerk to "adjudge probates taken before a commissioner of affidavits to be correct," etc. Act 1899, c. 235, requires that the clerk, passing upon the validity of the probate, shall order the deed, together with the certificate, to be recorded. Revisal 1905, c. 18, § 1001. It is held that, unless required by the statute, the certificate need not be registered. Cochran v. Improvement Co., 127 N. C. 386, 37 S. E. 496.

In the absence of any statute requiring the registration of the certificate, showing that the deed probated by the commissioner of affidavits has been passed upon, adjudged correct, and ordered to regis-

tration, why should we not presume, for the purpose of admitting a certified copy in evidence, that the registration was in accordance with the legal requirements? It will be further noted that the statute (Revisal 1905, § 1599) entitles a duly certified copy of any deed or writing, required or allowed to be registered, to be used as original evidence. The statute does not require that such certified copy shall include the certificate of probate. In Cochran v. Improvement Co., 127 N. C. 386, 37 S. E. 496, it is expressly held that the probate of a deed will be presumed from the fact that it is registered, and that it is not necessary to register the certificate as evidence of probate. Mr. Justice Furches, in an interesting and well-considered opinion, reviews the decisions of the Supreme Court. The decision has been cited with approval. Brown v. Hutchinson, 155 N. C. 210, 71 S. E. 302; Johnson v. Lumber Co., 147 N. C. 251, 60 S. E. 1129. Why is the certified copy not admissible upon the ground that it shows that the deed was placed on the record, in the county wherein the land lies, more than 40 years ago? Prof. Wigmore says:

"Where the alleged ancient original deed is lost (or otherwise unavailable) and a purporting official record is offered, made more than 30 years before, and certifying the deed's contents and execution, but inadmissible as an official record, because not made in accordance with statutory provisions, may not this ancient copy record serve as sufficient evidence of genuineness? * * * The defects in the record are, in a measure, technical only, and it still is entitled to some consideration as an official statement, and the long publicity of it has given ample opportunity, if any just ground existed, for doubting the original's authority. Accordingly, there has been a general disposition, on one ground or another, to accept such an ancient record, though otherwise inadmissible, as sufficient, after the lapse of time."

The learned author says:

"This conclusion has been usually accepted. * * * Moreover, the fact of possession of the land, as a confirming circumstance, seems often to be here insisted upon irrespective of its general requirements."

Among the illustrative cases cited by him are the following:

"Though the ancient record of a deed improperly acknowledged is not in itself evidence of the execution of the deed, yet such record, in connection with long and undisputed possession consistent with the deed, and other circumstances which tend, as a matter of fact, to show the probable execution and loss of such a deed, is admissible as evidence to go to the jury upon the question" of its execution. Townsend v. Downer, 32 Vt. 183.

"A copy of a deed * * * is, after 60 years, admissible in evidence to establish the grant under which the party claims title to the land in controversy." Stokes v. Dawes, 4 Mason, 268, Fed. Cas. No. 13,477.

"If it (the deed) had been recorded in the proper court of the proper county more than 20 years before the day of trial, the presumption was that its execution had been legally proved or acknowledged, and that the proper certificate had been 'written upon or under the deed.'" White v. Hutchings, 40 Ala. 253, 88 Am. Dec. 766.

In Bradley v. Lightcap, 201 Ill. 514, 66 N. E. 546, the deed had been recorded more than 30 years. It was admitted without any proof of acknowledgment.

Experience, the best test of the admissibility of ancient deeds and records, has demonstrated the wisdom of relaxing the rules of evidence to prevent injustice and promote security of title to land. It

is reasonably safe in such cases to presume that the sworn officers to whom is committed the duty of making the records have observed the law. The wisdom of this rule is illustrated in numerous cases. It is well known to every attorney in this state that it was not the custom in the past for the grantor to surrender to the grantee the deeds constituting his chain of title. The State Reports abound in cases illustrating the wisdom, if not necessity, of admitting the record of ancient deeds, with all reasonable presumptions, to sustain the regularity and validity of their registration. The security of titles is thus promoted.

Without passing upon the effect to be given to the certified copy of the deed, I am of the opinion that it was properly received in evidence by the master.

[2] Plaintiff offered in evidence a certified copy of a deed from Wm. Wallace to Geo. T. Wallace, July 29, 1844. This deed was recorded on the 26th of October, 1912, upon the affidavit attached to the original, which was also offered in evidence, of Gustavus Millheiser, president of the Richmond Cedar Works. The affidavit is drawn in accordance with the provisions of section 981, Revisal. This section is section 2 of chapter 147, Laws 1885, as amended by chapter 277, Laws 1905, which provides that:

"Any person * * * holding any unregistered deed or claiming title thereunder, executed prior to January 1, 1870 (originally 1855), may have the same recorded without proof of the execution thereof: Provided, that such person * * * shall make an affidavit * * * that the grantor * * * of such deed, and the witnesses thereto are dead or cannot be found, and that he, * * * cannot make proof of their handwriting. Provided, that * * * affiant believes such deed to be a bona fide deed and executed by, the grantor therein named. * * * Said affidavit shall be written upon or attached to such deed, and the same, together with such deed, shall be entitled to registration."

This statute (drawn by the writer) was incorporated in Act 1885, c. 147, to enable the large number of persons in this state, holding or claiming under unregistered deeds of 30 years of age or more, to put them upon the registration books. By this statute, a new policy in regard to the effect of registering deeds as muniments of title was introduced. For the first time in this state deeds which were registered were given priority, as against creditors and purchasers for value, over those claiming under unregistered deeds. The purpose of the statute was to secure the registration of deeds and increase the security of titles. Its provisions should be construed liberally to promote this end. The defendants objected to the introduction of this deed for that the president of the corporation was not authorized to make the affidavit unless so directed and authorized by a resolution of the board of directors; that the words "any person," etc., referred to the corporation, and the affidavit was the act of the corporation. I am unable to perceive the force of this objection. It is elementary that a corporation acts only through its officers or agents. While it may be that, as the custodian of its records, etc., the secretary may have more appropriately made this affidavit, there is no good reason why the president was not competent to do so. His authority to do an act for

the benefit of the corporation, ratified by its acceptance of such benefit, will be presumed. Bank v. Oil Co., 157 N. C. 302, 73 S. E. 93. The original deed was also introduced. The effect to be given its registration upon "vested rights" is not involved in the question of its admissibility. The affidavit conforms to the requirements of the statute. The certified copy was properly admitted.

[3] Plaintiff offered in evidence a deed executed by the Richmond Cedar Works, "Limited," "a partnership association," "formed under the laws of Virginia," and "Gustavus Millheiser * * * and William H. Parrish, Jr., the only members and stockholders of said association," to the Richmond Cedar Works, a body politic and corporate, etc. The deed is signed "Richmond Cedar Works, Limited, by Gustavus Millheiser, President," attested by the corporate seal, attached by Thos. K. Parrish, secretary. It is also signed by the individual stockholders under their private seals. It is duly probated and recorded. I am unable to perceive any ground upon which to sustain the objection to its admission. If it is not properly executed as the deed of the association, it is executed by all of the stockholders and members of the "partnership association," and carries the title to the land described therein. This disposes of the exceptions to the rulings of the master in regard to the admission of the deeds relied upon by plaintiff in deraigning its chain of title.

[4] Postponing, for the present, consideration of the exception to the master's fourth finding of fact, it will be convenient to review the essential facts relating to the title. Conceding that the land in controversy is within the boundaries of the Ben Jones grant, from the state, bearing date July 10, 1788, title is thereby out of the state. It is also manifest that it is within the boundaries of lot No. 7 of the New Lebanon division, made by commissioners appointed for that purpose by the court of pleas and quarter sessions, confirmed at May term, 1817, of said court. Lot No. 7 was allotted, in said division, to Wiley McPherson and Hallowell Old, as tenants in common. Wiley McPherson died, during the year 1832, and upon the petition of his heirs at law a portion of his lands, not including his juniper swamp lands, was sold for partition. Subsequent to 1832 the heirs of McPherson and Old filed a petition in the court of equity for a sale of the lands owned by them as tenants in common. A deed for a portion of said land, not including lot No. 7, made by the clerk and master, is introduced. No deed covering lot No. 7 is found or introduced.

On March 3, 1842, George Happer executed to Wm. Wallace and Gisbourn Cherry a deed sufficient in form to convey land describing a tract of juniper swamp containing boundaries corresponding with the boundaries of lot No. 7, and further described as—

"containing eight hundred and seventy acres, more or less, and is the same swamp that the said Happer purchased at the sale of Wiley McPherson, deceased."

This deed contains the following reservation:

"Except the lumber made by said Happer, and now remaining in said swamp and the privilege of carting it off."

On November 8, 1843, Gisbourn Cherry executed a mortgage to Josiah Cherry conveying, among other land—

"one half of a tract lying on both sides of Cross Canal, containing eight hundred acres, more or less, and is the same land that was purchased (by) Cherry and Wm. Wallace, deed bearing date March 3, 1842." Recorded November 10, 1843.

On January 6, 1845, Josiah Cherry, mortgagee, executed a deed to Gisbourn Cherry, Jr., reciting the said mortgage and a sale at public auction "in front of Samuel Foreman's tavern," after advertisement, conveying "one-half of a tract of eight hundred acres more or less, called the Happer tract." Recorded July 4, 1845. On December 7, 1846, Gisbourn Cherry, Jr., executed a deed to J. R. White, conveying juniper swamp described as the same land sold under a deed of trust and purchased by Gisbourn Cherry. Recorded March 26, 1847. On April 10, 1857, J. R. White and wife executed a deed to G. T. Wallace, conveying a certain juniper swamp—

"the same that was purchased by said White from Gisbourn T. Cherry, and is the south part of the tract known as the Happer swamp (the north part of which is owned by the said Wallace), containing four hundred acres more or less."

On July 29, 1844, William Wallace executed a deed to G. T. Wallace conveying—

"a certain tract of juniper swamp land, belonging to Gisbourn Cherry, Sr., and myself and is the same that was purchased by us from George Happer, a deed bearing date March 3, 1842, * * * containing eight hundred and seventy acres, more or less, and is the same swamp land that the said George Happer purchased at the sale of Wiley McPherson, deceased."

If the description in these deeds is sufficiently definite to admit parol evidence to locate the land, the paper title to lot No. 7, containing 870 acres, vested in G. T. Wallace on April 10, 1857, and such title as he had passed to and vested in the plaintiff by the other deeds in evidence.

The master finds from the parol evidence and the plats that these deeds cover the lands in controversy. To this finding defendants except, and insist that the description is not sufficiently certain and definite to admit parol evidence to locate the land. The master finds otherwise. The exception to this finding cannot be sustained. The master finds:

"That no other persons than plaintiff and those under whom it claims have claimed the lands since the date of the aforesaid (Happer) deed, March 3, 1842, and certainly not since 1869.

"That plaintiff and those under whom it claims have claimed and exercised control over the said tract of land.

"That the Wallaces begun operations on lot No. 7 in 1869, and that, in varying degrees, they and the plaintiff in this case have continued to the beginning of this suit.

"That the land is a juniper swamp, and valuable principally for timber which, for several years after 1870, could only be moved by tram or roll ways and canal or large ditches. When water was low, or during fly season, operations had to be suspended until these conditions changed. That from 1869 to 1876, the Wallaces subjected some portion of lot No. 7 continuously to the only use to which it was susceptible, and that after this time to 1886 there were varying degrees of operation on the land, and from 1880 to 1885 or 1886, the use and operation of the land were continuous. That plaintiff and those.

under whom it claimed, listed and paid tax on this land from 1872 to 1910, inclusive. There were several years during which the tax lists were lost. There is no evidence tending to show that defendants, or their ancestors, listed the land in controversy, for taxation.

"That the plaintiff does not connect itself with the grant, and therefore is compelled to rely upon an ouster under color of title and seven years' adverse possession. That the deeds under which plaintiff and those under whom it claims constitute color of title to said land, and that they have been in the adverse possession thereof, under such color of title, for more than seven years next before the filing of the bill herein.

"That the deeds under which defendants claim to own the said land constitute a cloud upon plaintiff's title. That the land in controversy is worth from $60,000 to $75,000. Defendants' exceptions challenge the correctness of each of these findings of fact, except the value of the land, and conclusions of law. Defendants Pinnix and Ferrebee except to the finding that defendant J. N. Gregory was, at the date of filing the bill herein, not a resident of the state of Virginia. This finding relates to the jurisdiction of this court."

There is sufficient evidence in the record to sustain the finding; the exception is overruled.

We are thus brought to a consideration of the findings and exceptions thereto, relating to plaintiff's title, and that is dependent upon the correctness of the findings in regard to the entry and adverse possession of plaintiff and those under whom it claims. Defendants offer no evidence that they, or those from whom they deraign title, have exercised any control, or act of dominion over, or in respect to, the land since 1842. They rely upon the legal title, conceded to have been in their ancestor, Wiley McPherson, at the time of his death and the principle of law which, in the absence of actual adverse occupation by another, draws the possession to it. The burden is therefore upon plaintiff to show such entry under color of title and adverse occupation, or possession, for seven years as will ripen into title. It is well settled, by numerous and uniform decisions of our Supreme Court, that such entry, followed by possession for seven years, not only bars the disseisee, but confers title upon the disseisor. In discussing the question of possession, and the evidence deemed sufficient to establish it, the courts have said:

"So much depends on the nature and situation of the property, the uses to which it can be applied, or to which the owner or claimant may choose to apply it, that it is difficult to lay down any precise rule, adapted to all cases." Ewing v. Burnet, 11 Pet. 53, 9 L. Ed. 624.

It has been said by our Supreme Court that, in seeking to ascertain whether the acts and conduct of a trespasser, continued for the statutory period, are sufficient to constitute an ouster, the leading idea is that there shall be notice to the world that the land is being subjected to that use to which it is susceptible. Moore v. Thompson, 69 N. C. 120. A recent decision of the Supreme Court of this state is peculiarly in point because the land in controversy is situate in the same section, and is of the same character, as that involved in this case. In Berry v. McPherson, 153 N. C. 4, 68 S. E. 892, Mr. Justice Brown says:

"The land in controversy appears to be swamp land, uninclosed, and with no habitation upon it. The evidence indicates that the plaintiff and his father for more than 30 years exercised acts of dominion over the land, and

made from it the only profits and use of which it is susceptible. From the evidence of the witnesses the jury may well infer that these acts were those of ownership and not those of an occasional trespasser, and that they were repeated and continuous for a considerable period of time. The possession was as decided and notorious as the nature of the land would permit."

In Locklear v. Savage, 159 N. C. 236, 74 S. E. 347, Mr. Justice Walker reviews the North Carolina decisions, which are controlling with this court in this case. He says:

"While the evidence offered is not necessarily conclusive, if taken to be true, as to the fact of possession, we think it is sufficient to be submitted to the jury, under appropriate instructions, that they may draw such inference as they see proper, bearing in mind that the burden of proof is on the plaintiff to establish the fact of possession for the statutory period by a preponderance of the proof."

Applying this rule to the testimony heard by the master, it is found that, while the evidence, coming from a large number of witnesses, many of them illiterate colored men, who had, at different periods of time, worked in the swamp, cutting and removing timber, was not always clear, either in their understanding or memory, frequently contradictory, there is much reliable and satisfactory evidence, both from witnesses and conditions, which justifies the finding of the master —the natural evidence, stumps, indicating the cutting of trees in large numbers at different periods of time; tramroads, indicating different periods of time of building and use, ditches, cut into the land; and other similar evidence, showing that the land was subjected to the use to which it was susceptible. There is also evidence of books, accounts, etc., showing that large quantities of timber were cut and removed from the land by Wallace. Of course, as is usual in such controversies, the evidence is conflicting, witnesses differing in their statements; there is evidence tending to show, and the master finds, that some years ago a controversy arose regarding the proper location of the western boundary of lot No. 7, between the Roper Lumber Company and' plaintiff, and that it was compromised by running a line, etc. Defendants contend that, while there is evidence of use and of control over portions of the land, it fails to show that such use extended over other parts of it; that for long periods of time the plaintiff and those under whom it claims made no use of any part; that the cutting was sporadic and limited, both in time and extent, to mere trespasses. There is evidence tending to support this contention. It is impracticable to analyze or discuss the evidence. The master, an intelligent lawyer, having much experience in dealing with questions of the character presented here, properly says:

"The evidence in this case is voluminous, and in many cases vague and uncertain, and sometimes contradictory."

It is necessarily so in such cases. He was doubtless impressed, as I am with the fact that since 1842 deeds have been executed conveying this land—many of them put to record between 1843 and 1846, others during the year 1871—reciting that this land was "purchased at the sale of Wiley McPherson, deceased"; that it was sold in 1845, after advertisement, at a public tavern; that the first deed (1842) contains

a reservation showing that Happer had cut timber on the land, and was "carting it away"; that from 1872 Wallace, who was claiming under these deeds, was listing the land and paying tax on it. These acts, accompanied by the cutting of timber, etc., were well calculated and sufficient to put the owners, if in fact the land had not been sold as the land of Wiley McPherson, deceased, upon notice and subject the claimants to an action.

[7] It is said that the ground upon which the disseisor acquires title by adverse possession is the laches of the owner. He sees his boundaries invaded by an adverse claimant, asserting title, and if he remains passive under such circumstances a sufficient length of time, he is held to acquiesce in the adverse claim; hence the possession must be open, notorious, and under a claim of right. This is required to enable the owner to be informed of the invasion of his rights that he may assert and enforce them by an action against the wrongdoer. Sedgwick & Wait, Trial of Title, etc., § 735. That the acts and conduct of plaintiff and those under whom it claims were of the character held by the courts of this state sufficient to be submitted to a jury upon the question of adverse possession is shown by reference to numerous cases. Respecting the continuity of the possession, which is equally essential as its character, the rule is well stated in Berry v. McPherson, supra:

"The testimony must tend to prove the continuity of possession for the statutory period either in plain terms or by 'necessary implication.' This possession need not be unceasing, but the evidence should be such as to warrant the inference that the actual use and occupation have extended over the required period, and that during it the claimant has, from time to time, continuously subjected some portion of the disputed land to the only use of which it was susceptible."

Applying to the findings of fact by the master the elementary rules by which courts are governed in passing upon exceptions, it is manifest that they should not be disturbed unless there is an absence of evidence to support them, or they are manifestly against the weight of the evidence. This rule is so uniformly followed by courts, and so essential to the orderly administration of justice, that a citation of authority is neither necessary nor justified. The findings of the master are entitled to the same weight as the verdict of a jury.

[5] Upon a careful consideration of the evidence, the arguments and the briefs of counsel, I am of the opinion that the report of the master, in respect to the title of the plaintiff, must be sustained. The exceptions in that respect are overruled. The defendants Pinnix and Ferrebee charge that plaintiff entered into a conspiracy with defendant J. N. Gregory and the heirs of Hallowell Old, who are not parties to this record, for the purpose of practicing a fraud upon the jurisdiction of this court; that J. N. Gregory is not a bona fide owner of any interest in the land; that he is a party to the alleged conspiracy with plaintiff, etc.

In his fourth finding of fact, the master says:

"Another question affecting the bona fides of J. N. Gregory and as to his adversary interest to plaintiff, in this cause: I am frank to confess, that the evidence on this point is confusing to me, and introduced some complications

that have been somewhat hard to reconcile, but from the character, reputation, and standing of the witnesses who testified upon this point, and the character of the evidence, I am constrained to hold that the purchase of J. N. Gregory, as disclosed by the deeds to him, was bona fide, and that his interest is antagonistic to plaintiff."

An examination of the evidence discloses a condition in respect to this phase of the case which fully justifies the state of mind in which the master found himself. It is a complicated and, in some respect, a remarkable story. Without calling into question the testimony of any of the witnesses, in regard to it, and accepting it as true, the inferences to be drawn from it are not altogether satisfactory. Assuming, however, that Warwick, in buying the Baxter and Grice interest, and having the deeds made to J. N. Gregory, his brother-in-law, purposed to promote the interest of his employer, the plaintiff; that Gregory is a mere nominal holder of the interest of Baxter and Grice —it is not perceived how the real merits of this controversy are affected. Conceding that the special proceeding brought by Gregory for partition in the superior court of Camden county was for the purpose of forcing the land to sale, it is not perceived how the decree in this case can affect the rights or defenses of the other defendants in that case. It is evident that Gregory's presence in this record has not interfered with the defense of the other defendants, or deprived them of any rights or advantages in making such defense. If, as the master finds, Gregory acquired no title under the Baxter and Grice deeds, no one else is injured; he, or Warwick, has paid out a considerable sum of money, and he will be called upon for his portion of the cost in this case. The scheme or conspiracy, if true as contended, will not avail Gregory in the suit in the state court, and of course the plaintiff, which is not a party to that record, will not be affected by the result of that case; that is, its legal rights will not be affected, and this court cannot take notice of other results or conditions. I do not perceive how, in any way, the rights or interests of the other defendants have been injuriously affected by the manner in which, or the purpose for which, Warwick purchased the Baxter and Grice interest, or what difference it makes to the other defendants that the deed was made to Gregory; nor do the briefs of counsel suggest that they were injured thereby. If any wrong was done to Baxter and Grice, and it seems that none was done them, this court could not, in this case, administer any relief, nor have they asked that it do so; that is a matter with which the other defendants have no concern. If there was any evidence, or well-grounded suggestion, that the defendants had been injured in their rights by the conduct of Warwick, and that he was acting as the agent of the plaintiff in producing such condition, this court would not hesitate to either make him a party and make such decree as the evidence warranted, or dismiss plaintiff's bill.

It is suggested that some of the heirs of Hallowell Old, who reside in Virginia, should have been made parties to this bill. This objection is not for the defendants; this court would make them parties if within its jurisdiction, or if they were found to be neces-

sary, but neither condition exists. The plaintiff, may, if otherwise entitled, proceed against those persons who hold deeds constituting clouds upon its title, or who are asserting adverse claim thereto, without bringing in others who may have an interest in the land, but not in the result of this suit.

[6] Defendants, in their brief, suggest that an issue be framed in regard to the question of possession and sent to a jury. The court would not hesitate to pursue this course, but for the fact that the testimony has been taken at a large outlay of time and cost. An intelligent master, of the selection of all parties, has heard and considered it with care and an earnest desire to arrive at a correct conclusion. It is to the interest of all parties that the litigation be concluded. A trial before a jury would involve much delay and great expense, without any reasonable ground to suppose that a different, or more satisfactory, result would be reached.

An anxious and careful examination of the record, the argument and brief of counsel, leads me to the conclusion that the report of the special master should be confirmed. A decree may be drawn in accordance therewith. The cost will be adjusted in the final decree.