[No. A131984. First Dist., Div. Two. Apr. 10, 2012.]

PETER CONNOLLY et al., Plaintiffs and Appellants, v.
WADE TRABUE et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part III.C.

Cᴏᴜɴsᴇʟ

Law Office of Duncan M. James and Donald J. McMullen for Plaintiffs and Appellants.

Wade and Ronda Trabue, in pro. per., for Defendants and Appellants.

Oᴘɪɴɪᴏɴ

**HAERLE, Acting P. J.—**

## I. INTRODUCTION

This case involves the issue of whether a prescriptive easement was acquired by plaintiffs and appellants Connolly (the Connollys) across adjacent real property owned by defendants and respondents Trabue (the Trabues) in a rural portion of southern Humboldt County. After a bench trial lasting approximately two weeks, the trial court ruled that, even if such an easement had been acquired by the Connollys, their claim to the right to use such was barred by the doctrine of laches because they had delayed in asserting their claimed prescriptive easement in a timely manner. In their appeal, the Connollys claim the trial court erred in so ruling, because laches cannot and does not apply in a factual situation such as this or in legal, as distinguished from equitable, actions.

█ We agree that the doctrine of laches is inapplicable in an action involving a claim for prescriptive title to an easement and hence reverse the judgment rendered in favor of the Trabues.

The Trabues, appearing in propria persona as they did in the trial court, cross-appeal from the trial court's denial of their claims for costs of suit,

attorney fees, and damages for trespass, emotional distress, and other alleged torts. We affirm that portion of the trial court's judgment.

## II. FACTUAL AND PROCEDURAL BACKGROUND[1]

In December 1995, the Connollys took title to two parcels of real property in the Connick Creek Subdivision, a rural area in Garberville, Humboldt County. The specific lots acquired by them were parcels Nos. 222-156-011 and 222-156-013 (hereafter lots 11 and 13). In December 2003, they purchased an adjacent parcel, i.e., No. 222-156-017 (hereafter lot 17) from Gregory Terry and Kate Cramer.

Prior to that purchase, the Connollys had entered into an agreement with a former defendant, Dan Dobbs (Dobbs), under which Dobbs agreed to purchase most of lot 17 from them, although the Connollys would keep title to a portion of that lot, including specifically a fir tree on that portion, and there would be a "lot line adjustment" to accomplish that. The Connollys alleged, in their first amended complaint in this action (FAC), that this lot line adjustment "was specifically for the benefit of the real property" they were retaining and already owned, i.e., lots 11 and 13.

On December 30, 2003, there were simultaneous closings of both transfers of lot 17, i.e., the transfer from Terry and Cramer to the Connollys and the Connollys' transfer of the same lot to Dobbs. However, the grant deed from the Connollys to Dobbs, a deed drafted by Dobbs, did not specify that a portion of lot 17, including the fir tree, was excepted from the transfer, although that portion "should have been excepted" therefrom and hence "run with, and been appurtenant to, the land retained and owned" by the Connollys, i.e., lots 11 and 13.

In February 2004, Dobbs transferred lot 17, as it had been deeded to him by the Connollys a few months earlier, to another former defendant, Young Jacobsen, who, in 2008, transferred the same property to the Trabues. According to the FAC, in those transfers, both the grantees and the real estate agents handling the transactions had been specifically advised and were thus allegedly "fully aware" of the lot line adjustment agreed to earlier between Dobbs and the Connollys. But the deeds from (1) the Connollys to Dobbs, (2) Dobbs to Jacobsen, and (3) Jacobsen to the Trabues did not conform to the agreement between Dobbs and the Connollys. To the contrary, and— according to the trial court—because of a "breach of contract and fraud" by

---

[1] Our summary of the factual background of this case is derived substantially from the clerk's transcript filed by the Connollys and, in particular, the trial court's statement of decision therein. This is so because no reporters' transcript was requested or filed by either party to this appeal and cross-appeal.

Dobbs, those deeds included *all* of lot 17, i.e., did not provide the Connollys with their promised "lot line adjustment" or fir tree.

In 1998,[2] prior to their purchase of lot 17 in 2003, the Connollys constructed a fence which enclosed not only their lots 11 and 13, but also the northerly portion of lot 17 (hereafter "disputed portion" or, per the trial court, "subject portion").[3] They did so for purposes of "their cattle and ranching use." The Connollys were thus aware of the discrepancy between where this fence had been built and where the property line of lot 17 actually was before 2003. This discrepancy was the basis for their 2003 agreement with Dobbs that they were retaining the disputed portion of lot 17, complete with the fir tree thereon. The problem, however, was that either Dobbs or the real estate agents he retained did not draft the 2003 deed of the property from the Connollys to himself consistent with that agreement. Instead, the deed gave Dobbs the *entire* lot 17, and such was subsequently transferred to Jacobsen and then to the respondents, the Trabues.

In December 2007, a month before the Trabues' acquisition of lot 17 in January 2008, Peter Connolly and Wade Trabue met and discussed the Connollys' claimed interest in the disputed portion of lot 17. At that meeting Connolly informed Trabue that he and his wife "maintained a claim to the subject portion of" lot 17 before the Trabues had acquired title to it. But no agreement was reached regarding that portion of lot 17. However, according to the trial court's statement of decision, "[a]t various times throughout the years since 1995, Peter and Deborah made improvements to the subject portion of Parcel 17 and the gate and fence located thereon. Peter and Deborah's use was not concealed and was at all times open, apparent, visible, and adverse to all others claiming a right to the subject portion of property. Peter and Deborah regularly locked the gate leading into the subject portion of Parcel 17. Peter and Deborah were never given permission by anyone to use the subject portion [of] Parcel 17 as described and no one ever interrupted said use. The Trabues observed [the] Connolly's [*sic*] use of the subject portion of Parcel 17, and Peter informed Wade at a December 2007 meeting that the Connolly's [*sic*] maintained a claim to the subject portion of Parcel 17, before Wade and Ronda acquired title to Parcel 17. Wade and Ronda filed their cross complaint to halt such use on July 2, 2009."

As the trial court found in its statement of decision, during the period of time prior to the Trabues' acquisition of lot 17 in January 2008, "[t]he

---

[2] Per the FAC, the fence was constructed in 1998. In its statement of decision, the trial court did not indicate a different date, although at one point it did suggest that the Connollys had "used . . . the subject portion of property" (meaning the subject portion of lot 17) since 1995.

[3] According to two filings by the Trabues, the disputed portion of lot 17 was either 1.13 acres or 1.33 acres.

Connolly's [*sic*] acquired parcels 11 and 13 in 1995, and since that time, the Connolly's [*sic*] used, and have continued to use said property, as well as the subject portion of property for cattle and other ranching purposes, including cattle pasturing, cattle watering, cattle corralling, repairing the fence and the gate, grading, maintenance and other improvements, and equipment and materials storage; the Connolly's [*sic*] predecessors-in-interest to parcels 11 and 13 also used said property; along with the subject portion of Parcel 17, in a similar manner for numerous years preceding that time and through the time the Connolly's [*sic*] acquired parcels 11 and 13.

"Said use by the Connolly's [*sic*] of the subject portion of the property was without the permission or consent of any record title holder of Parcel 17; no such record title holder ever physically interfered with said use by the Connolly's [*sic*] of the subject portion of the property; the Connolly's [*sic*] did not ever request permission to use said portion of the property.

"Said use by the Connolly's [*sic*] of the subject portion of property occurred on those occasions when it was reasonably necessary for the convenience of the Connolly's [*sic*] and their cattle and ranching use considering its purpose, size, and scope.

"Said use by the Connolly's [*sic*] of the subject portion of property was not hidden or concealed and was apparent and done openly, visibly, and in plain view.

"Said use by the Connolly's [*sic*] of the subject portion of property included the practice of keeping locked the gate located on Connick Creek Road on Parcel 17.

"Said use by the Connolly's [*sic*] of the subject portion of property is reasonably necessary to the use and benefit of parcels 11 and/or 13.

"The Trabue's [*sic*] observed said use by the Connolly's [*sic*] prior to January 29, 2008, which is the date title to Parcel 17 was transferred to the Trabue's [*sic*].

"The aforementioned fence has been in its current location, without being moved in any significant manner, since at least the time the Connolly's [*sic*] acquired parcels 11 and 13; the fence and gate on Connick Creek Road with Parcel 17 operate to keep cattle north of the fence."

On May 14, 2009, the Connollys filed their FAC against the Trabues (and several subsequently dismissed defendants, including Dobbs) asking for

declaratory relief, quiet title, and other relief establishing their right to an easement over the disputed portion of lot 17.

On July 2, 2009, the Trabues answered the FAC and filed a cross-complaint asking, also, for quiet title relief, a restraining order, injunctive relief, and both compensatory and punitive damages for trespass, damage to real property, and infliction of emotional distress.

The case was tried to the court over a period of approximately two weeks in July and August of 2010. As noted earlier, no reporters' transcript of any portion of that trial was requested by either of the parties to this appeal. But from the record before us, we know that, on December 27, 2010, the trial court filed its statement of decision finding that, although the Connollys had established an easement over the disputed portion of lot 17, their claim to such was barred by the doctrine of laches. The court also found that the various claims of the Trabues against the Connollys also failed for various and sundry reasons (to be discussed in more detail below), including the bar of the statute of limitations, failures in pleading, and lack of supporting evidence.

On December 28, 2010, the trial court filed an original judgment consistent with its statement of decision, and also awarding the Connollys $30,000 in damages against the since-dismissed original defendant Dobbs.

On January 26, 2011, the Connollys filed a motion to set aside that judgment, a motion the Trabues opposed. The trial court denied that motion on March 1, 2011.

On March 16, 2011, an amended judgment was filed. The Connollys timely appealed from it on May 10, 2011.

### III. DISCUSSION

A. *Our Standards of Review.*

Inasmuch as the trial court's decision was substantially based on an issue of law, i.e., the application of the doctrine of laches to the Connollys' claim of an acquisition of a prescriptive easement, our review of that issue is de novo. Because of the combined legal and factual bases for the trial court's denial of the various claims of the Trabues against the Connollys, our review is (1) de novo as to issues of law, i.e., the applicability of the statute of limitations, and (2) based on the substantial evidence standard of review as to those portions of the Trabues' claims the trial court found were not supported

by the evidence on the record before it. (See 9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, §§ 322–325, pp. 369–375.)

## B. *The Trial Court's Ruling on the Issue of Laches Was Incorrect.*

In its statement of decision, the trial court devoted two paragraphs to explaining why the Connollys could not prevail on their quiet title and other claims as to the subject portion of lot 17. Those paragraphs read: "However, the Doctrine of Laches applies to the Connolly's [*sic*] easement and related causes of action applicable to the Trabue's [*sic*]. Peter and Deborah having knowledge that Dan Dobbs breached the contract of sale, sat on their rights for an appreciable delay, which if pursued would have prevented prejudice that occurred with regard to Wade and Ronda. Wade and Ronda ended up in a delayed lawsuit together with their deed to Parcel 17. This unfortunate result came about by the delay of Peter and Deborah bringing their lawsuit in a timely fashion. The Doctrine of Laches is not used to punish Peter and Deborah; it is meant to prevent unwarranted justice [*sic*: injustice]. Peter and Deborah shall take nothing for their cause of action for prescriptive easement, implied easement, express easement, equitable easement, easement by estoppels or boundary line by practical location, and thus their corresponding causes of action to quiet title and for declaratory relief as well.

"The Court, having found that the Doctrine of Laches applies to Peter's and Deborah's easement and related actions, finds that Wade and Ronda own Parcel 17 (in Terry—O/Connick Creek Subdivision), including the subject portion thereof, in fee simple without any prescriptive impediments. Wade and Ronda shall therefore prevail on their quiet title cause of action and in defense of Peter and Deborah's actions regarding the same."

Although the trial court never explicitly found that the Connollys had acquired a prescriptive easement over the disputed portion of lot 17, it implicitly did so by the reference in the foregoing portion of its statement of decision to "the Connolly's [*sic*] easement."

We agree with the implicit finding of the trial court that, under the facts recited in its statement of decision, the Connollys had acquired an easement by prescription over the disputed portion of lot 17. However, we disagree with its ruling that their entitlement to the occupation and use of that easement was nullified by laches.

With regard, first of all, to the establishment of an easement by prescription, the facts as found by the trial court in its statement of decision (and facts not even slightly refuted by the Trabues in their briefs to us) establish that the Connollys continuously and openly used the disputed portion of lot

17 for approximately 15 years prior to any controversy arising between them and the Trabues or any of the prior legal owners of lot 17. That usage started in at least 1998. As noted above, that is the year the Connollys alleged in their FAC that that usage commenced. The trial court's statement of decision not only does not contradict that, but appears to find that that usage of the disputed portion started even earlier, i.e., in 1995. We will thus assume that the implicit finding by the trial court that the Connollys had an easement means an easement created by prescription.

■ "A prescriptive easement in property may be acquired by open, notorious, continuous, adverse use, under claim of right, for a period of five years. [Citations.] Although the trial court's finding of the existence of a prescriptive easement must be based upon clear and convincing evidence, if there is substantial evidence to support its conclusion, the determination is not open to review on appeal." (*Applegate v. Ota* (1983) 146 Cal.App.3d 702, 708 [194 Cal.Rptr. 331]; see also, to the same effect, *Baker v. Burbank-Glendale-Pasadena Airport Authority* (1990) 220 Cal.App.3d 1602, 1609 [270 Cal.Rptr. 337]; 6 Miller & Starr, Cal. Real Estate (3d ed. 2000) § 15:29, pp. 15-110 to 15-113 (rel. 8/2006).) There clearly was such substantial evidence here, as the portions of the trial court's statement of decision quoted above make clear. And nowhere in the Trabues' briefs do they cite any evidence in the record refuting a finding of the creation of an easement by prescription.

Which brings us to the second and key ruling of the trial court regarding the easement held by the Connollys over the disputed portion of lot 17: that their continued entitlement to such an easement was barred by the doctrine of laches, i.e., that the Connollys, after learning that Dobbs "breached the contract of sale, sat on their rights for an appreciable delay" and thus failed to bring "their lawsuit [regarding the disputed portion of lot 17] in a timely fashion."

We disagree with this ruling of the trial court for several separate and distinct reasons.

■ First of all, in a pertinent case relied on by the Connollys in their briefs to us (but neither cited nor discussed in the Trabues' briefs), our colleagues in the Third Appellate District made clear that laches is not a bar to a claim of adverse possession. That being the case, and a claim of an easement by prescription being a legal twin to a claim of adverse possession, the doctrine of laches simply cannot and does not apply here.

The key authority to this effect is *Marriage v. Keener* (1994) 26 Cal.App.4th 186 [31 Cal.Rptr.2d 511] (*Keener*). In that case, the trial court had dismissed

a quiet title action (i.e., an action similar to that brought by the Connollys here) because it was based on a claim of adverse possession, and such a claim was, the trial court ruled, barred by laches. The Third Appellate District unanimously disagreed, writing: "Laches requires 'a showing of unreasonable delay on the part of the plaintiff in bringing the action, which may show abandonment or waiver of a right, or the acquiescence by the plaintiff in the defendant's fault.' [Citation.] Although the doctrine of laches is often asserted in cases involving adverse possession, typically the facts involve a defendant adverse possessor asserting laches as an additional defense against a plaintiff record owner's action to recover the property. [Citations.] The interrelated nature of laches and adverse possession creates an inherent incongruity to finding laches a defensive bar to a claim of adverse possession. (See *Richmond Cedar Works* v. *Pinnix* (D.N.C. 1913) 208 F. 785, 795 ['[i]t is said that the ground upon which the disseisor acquires title by adverse possession is the laches of the owner']; *Berger* v. *Horsfield* (1919) 188 A.D. 649 [176 N.Y.S. 854] ['title gained by adverse possession rests upon the laches of the real owner who fails to assert his title against the one claiming adversely . . . .'].)

"Defendants cite no cases holding laches to bar a claim of adverse possession, and apparently no published California opinion so holds. Other jurisdictions addressing this issue have reached the opposite conclusion. [Citations.]

" 'Laches is an implied waiver resulting from knowing acquiescence in existing conditions and an inexcusable delay in asserting a right which results in prejudice to the adverse party. [Citation.] In other words, laches addresses delay in the pursuit of a right when a party must assert that right in order to benefit from it. [¶] . . . Fee simple title vests in the adverse possessor by operation of law at the moment the requisite conditions for adverse possession have been established for the statutory period. [Citation.] The adverse possessor is not required to take any further steps to acquire title once those conditions have been met. The statute of limitations runs against the title holder, not the adverse claimant. [Citation.] [¶] The [adverse possessors] asserted their claim by maintaining adverse possession of the disputed area for the entire statutory period. There was no significant delay because the [adverse possessors] were under no obligation to take further action once they had acquired title by operation of law.' [Citation.]

"California law does not require a plaintiff to bring an action to perfect his or her claim of adverse possession. Rather, it is the record owner—not the intruder—who must bring an action within five years after adverse possession commences in order to recover the property. (Code Civ. Proc., § 318.)" (*Keener, supra,* 26 Cal.App.4th at pp. 190–191; see also 6 Miller & Starr, Cal. Real Estate, *supra,* § 16.17, pp. 36–38 (rel. 9/2000); cf. *Gerhard v. Stephens* (1968) 68 Cal.2d 864, 903–906 [69 Cal.Rptr. 612, 442 P.2d 692].)

As noted above, the Trabues not only do not cite or discuss the holding of *Keener*, they cite no authority to the contrary of the holding in that case.[4] And, per the trial court's findings in its statement of decision, the Connollys had, since at least 1998, been openly using some of lot 17 for their ranching activities, and had also fenced in that portion so as to effectively combine it with their lots 11 and 13. To again quote the trial court's relevant findings, the Connollys' use of the disputed portion of lot 17 "was not concealed and was at all times open, apparent, visible, and adverse to all others claiming a right to the subject portion of property." And, to the same effect, the trial court also found that this "use by the Connolly's [*sic*] of the subject portion of the property was without the permission or consent of any record title holder of Parcel 17; no such record title holder ever physically interfered with said use by the Connolly's [*sic*] of the subject portion of the property; the Connolly's [*sic*] did not ever request permission to use said portion of the property."

We agree with the Connollys' argument to us that these findings regarding the substantial time during which the Connollys adversely used the disputed portion of lot 17 before any controversy arose regarding that portion only strengthens their prescriptive easement claim. As the *Keener* court (and the authorities it cited) concluded, these findings regarding the time lapse between the commencement of the Connollys' open and obvious use of the disputed portion of lot 17 and the start of their legal controversy with the Trabues can only work in favor of the Connollys' claim of entitlement to a prescriptive easement. (See *Keener, supra*, 26 Cal.App.4th at pp. 190–192.)

 But there is a second reason the trial court erred in its holding regarding laches: this was an action at law, not equity, and it is well established, both in California and generally, that laches applies to equitable actions, not actions at law. (See, e.g., *Abbott v. City of Los Angeles* (1958) 50 Cal.2d 438, 461 [326 P.2d 484]; *Bagdasarian v. Gragnon* (1948) 31 Cal.2d 744, 752 [192 P.2d 935]; *Blue Cross of Northern California v. Cory* (1981) 120 Cal.App.3d 723, 743–744 [174 Cal.Rptr. 901]; *Lubin v. Lubin* (1956) 144 Cal.App.2d 781, 793 [302 P.2d 49]; see also other authorities cited in those cases.) And it is also clear that an action to determine the existence of an easement by prescription, whether via a claim for quiet title or a request for declaratory relief, is an action at law and not equity. (See *Arciero Ranches v. Meza* (1993) 17 Cal.App.4th 114, 125–126 [21 Cal.Rptr.2d 127] (*Arciero*); *Frahm v. Briggs* (1970) 12 Cal.App.3d 441, 445–446 [90 Cal.Rptr. 725] (*Frahm*).)

---

[4] It should also be noted that the Connollys did not cite *Keener* for the first time in this court. They specifically relied on it in their memorandum of points and authorities in support of their January 26, 2011, motion to set aside or vacate portions of the trial court's original judgment.

There is also a third reason why the trial court's ruling regarding laches fails: there is no substantial evidence in the record provided us, much less any cited in the trial court's statement of decision, as to when the Connollys discovered that their agreement with prior defendant and prior lot 17 owner Dobbs had not been carried out by him, i.e., that Dobbs had breached his contract with the Connollys to make the agreed-upon lot line adjustment regarding lot 17.

To recapitulate the relevant facts: According to the Connollys' FAC, they first constructed the fence separating the disputed portion of lot 17 from the remainder of that lot in 1998. But, per one portion of the trial court's statement of decision, they might have even started using the disputed portion three years earlier, i.e., in 1995. And, again, according to the statement of decision, a "contract existed between [the Connollys] and [Dobbs] that a lot line adjustment would be accomplished as to" lot 17. Although the statement of decision does not mention any date for that "contract," that date was almost certainly sometime in late 2003, because Dobbs did not take title to that lot until December 2003, and then sold it to Jacobsen a few months later, a transfer which, according to the trial court, the Connollys did not learn about until "the spring or summer of 2004." In the course of so doing, Dobbs apparently deliberately failed to make the lot line adjustment. Thereafter, as noted above, lot 17 was transferred by Jacobsen to the Trabues in January 2008.

But the statement of decision does not state, or even suggest, when during that time—or later—the Connollys *discovered* that Dobbs's deed to Jacobsen did not conform to his agreement with the Connollys to make the lot line adjustment in that deed. All we know from the statement of decision is that in December 2007, shortly before the Trabues acquired title to lot 17, there was a meeting between Peter Connolly and Wade Trabue wherein the Connollys' "claimed interest in the subject portion of [lot 17] was discussed." How long before this meeting the Connollys knew that the 2003 deed from Dobbs to Jacobsen did not conform to their agreement with Dobbs, we do not know from the statement of decision, or from anything else in the record provided us. However, the trial court did state, indeed twice in its statement of decision, that the Trabues had "observed said use [of the disputed portion of lot 17] by the Connolly's [*sic*] prior to January 29, 2008, which is the date title to Parcel 17 was transferred to the Trabue's [*sic*]."

Thus, according to that record, the first time during the period from 2003 to January 2008 that the Connollys apparently knew that the lot line adjustment had not been made in the various preceding deeds was in December 2007, i.e., the date of the meeting between Peter Connolly and Wade Trabue. But, after that date, the dispute between the Connollys and the

Trabues escalated quickly. Indeed, the Connollys' initial complaint was filed in September 2008, i.e., nine months after the obviously unsuccessful Peter Connolly/Wade Trabue meeting the previous December. Thus, and based on the record before us, and especially because of the absence of any evidence therein that the Connollys knew, prior to December 2007, of the Dobbs "breach of contract and fraud," this nine-month period simply does not satisfy any test for laches—again, even assuming that doctrine applies in a case such as this.

In any event, the application of the doctrine of laches requires a showing of prejudice to the party allegedly adversely affected. (See *Lam v. Bureau of Security & Investigative Services* (1995) 34 Cal.App.4th 29, 36 [40 Cal.Rptr.2d 137].) The Trabues' briefs to us cite to no evidence in the record that, subsequent to their acquisition of lot 17, they were in any way prejudiced by the failure of the Connollys to assert their rights to the disputed portion of that property.

In those briefs, the Trabues cite no evidence regarding when the Connollys first learned of Dobbs's failure to adhere to the lot line adjustment agreement he had made with the Connollys. Indeed, in the portions of their briefs addressing the Connollys' appeal, the Trabues cite very little evidence from the record, relying largely on citations to their pleadings and to exhibits in the record (many of them photographs of the disputed portion of lot 17), some of those exhibits having been admitted by the trial court and some not.[5] Put another way, the Trabues cite very little actual evidence supporting their position regarding the prescriptive easement the trial court found the Connollys had acquired regarding the disputed portion of lot 17.

With regard to that easement, the Trabues argue that the *"trial court findings of fact are in error"* regarding the Connollys' right to any sort of an easement with regard to the disputed portion of lot 17. But, regrettably, and for the reasons indicated above, this position cannot be sustained because the Trabues cite no evidence in the record running contrary to the implicit finding of the trial court that the Connollys had acquired a prescriptive easement over that portion of the lot, much less any evidence *in the record* rebutting the trial court's rather detailed findings regarding the Connollys' 1995 to 2008 usage of the disputed portion of lot 17, usage which resulted in their prescriptive

---

[5] As noted above, the Trabues filed their briefs in propria persona, and also did not file any reporters' transcripts. The clerk's transcript, including the augment of the same that the Trabues filed, contains copies of many exhibits (including many photographs), some apparently admitted into evidence by the trial court and some not. But whether or not admitted, many such exhibits are cited by the Trabues in their briefs, along with their trial court pleadings. Clearly, citations to their pleadings and to exhibits that were not admitted into evidence at trial do not satisfy the requirement that a party to an appeal cite *evidence* included in the record of the trial court to support their contentions to an appellate court.

easement. And, clearly, the trial court understood that the Trabues were, in the trial before it, "disclaim[ing] any . . . interest" of the Connollys in any portion of lot 17.

With regard to the applicability of the doctrine of laches, again the Trabues do not discuss *Keener* in any of their briefs to us. The only two cases they cite regarding that issue, *Bryant v. Blevins* (1994) 9 Cal.4th 47, 60 [36 Cal.Rptr.2d 86, 884 P.2d 1034] (*Bryant*) and *Muktarian v. Barmby* (1965) 63 Cal.2d 558 [47 Cal.Rptr. 483, 407 P.2d 659] (*Muktarian*), do not undermine the principles stated in *Keener* in the slightest. *Bryant* did not involve or address the issues of adverse possession, prescriptive easements, or the doctrine of laches; rather it involved the interpretation and application of the "agreed-boundary doctrine." (*Bryant, supra,* 9 Cal.4th at pp. 53–60.)

*Muktarian* was a case involving the application of the statute of limitations to a quiet title claim. In its brief opinion in that case, the court included one sentence of dicta suggesting that laches might bar a quiet title action if the delay "in bringing [the] action has prejudiced the claimant." (*Muktarian, supra,* 63 Cal.2d at p. 561.) However, clearly a quiet title action is now considered to be one in law, not equity, and hence the doctrine of laches cannot apply. (See, e.g., Code Civ. Proc., § 764.020, subd. (b); 5 Witkin, Cal. Procedure (5th ed. 2008) Pleading, § 662, pp. 88–89, ¶ 4; 3 Witkin, Cal. Procedure (5th ed. 2008) Actions, §§ 133–135, pp. 212–215.) And, as the authority cited above confirms, this is especially true regarding actions to establish the right to a prescriptive easement. (See, e.g., *Arciero, supra,* 17 Cal.App.4th at pp. 125–126; *Frahm, supra,* 12 Cal.App.3d at pp. 445–446.)

C. *The Trial Court's Rulings Regarding the Trabues' Claims Were Correct.**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## IV. DISPOSITION

The amended judgment in favor of the Trabues on the declaratory relief, quiet title, and other claims brought against them by the Connollys in the FAC is reversed, and the matter remanded to the trial court with directions to

---

*See footnote, *ante,* page 1154.

enter judgment in favor of the Connollys in a manner consistent with this opinion. The amended judgment in favor of the Connollys on the claims brought against them by the Trabues is affirmed in its entirety. Costs on appeal are awarded to the Connollys.

Lambden, J., and Richman, J., concurred.

The petition of defendants and appellants for review by the Supreme Court was denied June 27, 2012, S202075.