[L. A. No. 16210. In Bank.—March 3, 1939.]

PACIFIC WESTERN OIL CO. (a Corporation), Respondent, v. BERN OIL COMPANY, LTD. (a Corporation), et al., Appellants.

Abe Richman and Sidney J. Unickel for Appellants.

Borton, Petrini & Conron and D. E. Staples for Respondent.

CURTIS, J.—The following statement of facts prepared by the Fourth District Court of Appeal at the time the cause was before that court for decision appears to be correct, and we, therefore, adopt the same for the purposes of this opinion:

"This is an appeal from a judgment restraining the defendants from taking oil from certain land controlled by the plaintiff and awarding compensation for oil already taken.

"Briefly stated, the general facts are as follows: The plaintiff, as lessee under an oil and gas lease covering a certain quarter section of land, drilled for oil and completed seven producing wells thereon. In the course of operations it was discovered that due to a 'fault' which ran across this quarter section oil could be produced on a part of this land but not on the remainder. Acting under a right given in its lease the plaintiff, on May 18, 1931, quitclaimed approximately 104 acres of this land to the owner and lessor, retaining a described tract of about 56 acres upon which oil had been developed, and specifically reserving all rights thereto as given by the original lease. For convenience, the 56 acres which were retained will be referred to as parcel A and the 104 acres which were reconveyed will be referred to as parcel B.

"On March 13, 1933, the defendant Brunwin procured a lease covering parcel B from the owner, to whom it had been reconveyed. Brunwin, with two associates, Abe Bernstein and Sam Bernstein, commenced the drilling of wells on parcel B and then organized a corporation, the defendant Bern Oil Company, through which the project was continued. The corporation was largely owned by these three individuals, who acted as its officers and remained in active charge and management of its affairs. Three wells were drilled on

parcel B, one being 21½ feet; one 17 feet and one 39 feet east of the boundary line between parcel B and parcel A, a surveyor having been employed by the defendants to exactly locate that boundary. Each of these wells was intentionally diverted from the perpendicular in a westerly direction in order to bottom the well in the producing area underneath parcel A. In each instance the producing portion of the well was located from 290 feet to 480 feet west of the boundary line between the two tracts and within parcel A. This result was accomplished by the use of a mechanical device, commonly called a whipstock, capable of diverting a well from the vertical. To this end the defendants employed an expert in surveying and controlling directional drilling. The expert used an instrument and method commonly called a 'singleshot' in order that the course and extent of deviation of the wells might be known and charted as the work progressed, and from time to time furnished the defendants with reports showing the extent and direction to which the wells had been diverted, and finally furnished them with a plat or graph showing the point of completion of the wells under the surface of parcel A. There is evidence that in each instance the well had to be 'whipstocked' to the west, through the fault, and under parcel A in order to produce.

"The first of these wells was completed on June 20, 1933, the second on September 14, 1933, and the third on January 16, 1934, and oil was taken from all of them. In November, 1933, the plaintiff wrote a letter to the defendants demanding that they cease trespassing upon its lands. In March, 1934, a grand jury investigation of the defendants' activities was started, resulting in an indictment against the individuals for grand theft. (See *People* v. *Brunwin,* 2 Cal. App. (2d) 287 [37 Pac. (2d) 1072].) The defendants continued to produce oil and the present proceeding was begun on July 17, 1934, a preliminary injunction being issued on August 6, 1934. The injunction was disobeyed and after citation the individual defendants above named were adjudged guilty of contempt and fined. An attempt to review the contempt proceedings by writ of *certiorari* failed. (*Bern Oil Co.* v. *Superior Court,* 5 Cal. App. (2d) 21 [41 Pac. (2d) 939].)

"In addition to alleging most of the facts above set forth the complaint herein alleged that the defendants Brunwin, Abe Bernstein and Sam Bernstein entered into a conspiracy

with the object and purpose of obtaining the right to occupy the surface of parcel B in order to commence thereon the drilling of wells, to drill these wells in such a manner as to cause them to cross over the boundary line and under parcel A, thus penetrating the pool or deposit of oil under said land, and through such wells to remove such oil and bring it to the surface of parcel B; that in pursuance of such plan and conspiracy they obtained a lease from the owner of parcel B and started wells thereon which were intentionally diverted into parcel A and into the oil pool or deposit underlying that parcel at a distance of several hundred feet from the boundary line between the two parcels; that thereafter they commenced to remove oil from parcel A and continued such removal, bringing the same to the surface of parcel B; that they thus removed and converted to their own use oil of a value of $75,000 to the damage of the plaintiff in that amount; that after the organization of the Bern Oil Company these acts were performed by the individual defendants through the agency and instrumentality of that corporation; and that the defendants have installed upon parcel B a derrick and apparatus for the drilling of a fourth well in a similar manner across the boundary and into parcel A. The prayer is for a temporary injunction pending the trial and thereafter for a permanent injunction restraining the defendants from removing oil from strata underlying the lands of the plaintiff, from removing oil from any of the three wells which have been mentioned, from diverting or directing the drilling of any other well in such a manner as to cross the boundary line between the parcels A and B, for the sum of $75,000 damages, for an accounting as to any oil or gas already removed, and for such other relief as may be just and appropriate.

"While the answer does not deny that the defendants secured a lease covering parcel B, that they entered that land and installed machinery and equipment for drilling, that they employed mechanics skilled in the art of directional drilling or that they intentionally so controlled the direction of the drilling of these wells as to cross over under parcel A, it does deny that these things were done in pursuance of any conspiracy and it is further alleged that the defendants have no knowledge as to the penetration of the oil deposit underlying parcel A or as to the distance of such alleged penetration from

the boundary line of parcel B, and on that ground it is denied that the three wells drilled upon parcel B penetrated the oil deposit under parcel A to a distance of several hundred feet from the boundary line. It is admitted that oil has been produced from the three wells thus drilled by the defendants and it is alleged that it is impossible to ascertain definitely the actual location of the bottom of an oil well by any means now known. It is denied that any oil produced from these three wells is the property of the plaintiff, and denied that the plaintiff has been damaged in any amount. It is then alleged that any oil taken from these wells belonged to the defendants, that the plaintiff had surrendered and abandoned all its rights in and to any oil strata, and all its rights in and to any part of the land covered by the original lease, except that the plaintiff had retained the right to produce oil from the seven wells in operation when the quitclaim deed was given to the owner of the land, and that said wells were all located in a zone known as the 'Upper Vedder Zone' being approximately 1400 feet in depth, while the three wells drilled by the defendants were located at a depth of approximately 2000 feet in a zone known as the 'Lower Vedder Zone'. These last allegations disclose the main issue upon which the case was tried, the defendants having contended throughout that the rights of the plaintiff were limited to the operation of the seven wells existing at the time parcel B was reconveyed to the owner of the land and that the defendants had the right to remove oil from any strata on parcel A which was lower than the one which had been penetrated by those wells.

"The court found in all respects in favor of the plaintiff, substantially in accordance with the allegations of the complaint, finding the existence of such a conspiracy to drill wells upon parcel B in such a manner as to direct them over the boundary and into parcel A for the purpose of removing oil therefrom, and that in pursuance of this conspiracy and plan experts in the art of controlling the direction of drilling wells were employed for the purpose of diverting these wells, and they were so diverted, over the line and into parcel A. It was further found that oil was thus removed from parcel A, that the defendants well knew that there was a productive pool or deposit under parcel A, and no such production deposit under parcel B, and that the defendants 'intentionally,

secretly and fraudulently employed the right to occupy the surface of. parcel B for the purpose of accomplishing a clandestine and secret penetration of such productive oil pool' underneath parcel A and the removal therefrom of oil. It was then found that from the accounting which had been had of the production and sale of oil thus taken by the defendants from underneath parcel A and converted to their own use, it appeared that oil of the value of $107,371.93 had been so removed, and that the royalty thereon which had been paid to the owner of the land, and which otherwise would have been payable by the plaintiff, amounted to $17,737.26.

"Abe Bernstein died before judgment was entered and the action was dismissed as to him and the executors of his estate. Judgment was entered against the other defendants perpetually enjoining them from removing through the three wells referred to or through any other well any oil, gas, or other hydrocarbon substances from any point beneath the surface of parcel A, and awarding judgment against the defendants H. M. Brunwin, Sam Bernstein and Bern Oil Company, Ltd., jointly and severally, in the sum of $89,643.97. From this judgment two of the defendants have appealed."

Appellants first contention is that the court committed prejudicial error in denying their request for a jury to try certain issues of fact presented by the pleadings herein. The action against them, as we have seen, was one in which the respondent prayed for an injunction restraining appellants from operating, pumping or removing petroleum oil from strata underlying the lands of respondent, and for damages in the sum of $75,000 sustained by respondent by the pumping and removal of petroleum oil by appellants from said lands of the respondent prior to the commencement of this action. Respondent under its complaint had two rights of action and was entitled to two remedies, the legal remedy of damages for past injuries and the equitable remedy of injunction to prevent their recurrence in the future. (*Hughes* v. *Dunlap*, 91 Cal. 385 [27 Pac. 642].)

In that case, it was held (page 388) : "It has long since been held that under our system a legal and equitable remedy may be sought in the same action; but each remedy must be governed by the same law that would apply to it if the other remedy had not also been asked for. An action to recover damages for past trespasses is as clearly a legal remedy as

any that could be named; and it is an action in which a party cannot be deprived of a jury trial. For this reason, therefore, the judgment must be reversed.'' In *Hughes* v. *Dunlap, supra,* the plaintiff sued to recover damages alleged to have been sustained by the plaintiff by the acts of the defendant in entering upon plaintiff's land and tearing down and removing a fence thereon and for an injunction to restrain defendant from continuing said acts. A jury was empaneled and certain issues of fact were submitted to them. Upon such issues the jury returned a verdict in favor of the defendant. Afterwards the court made findings in which it ignored the verdict of the jury and found in favor of plaintiff on the question of damages. Upon these findings the court rendered judgment for the plaintiff for damages and enjoined the defendant from opening and interfering with said fences. This judgment, as we have seen, was reversed by the Supreme Court for the reason that the defendant was entitled to a trial by jury upon the issues of damages, notwithstanding the action also embraced the equitable remedy for an injunction. This case was cited and followed by the court in the decision of *Farrell* v. *City of Ontario,* 39 Cal. App. 351 [178 Pac. 740], in which action the judgment of the trial court was reversed, where the trial court disregarded the verdict of the jury upon the question of damages and attempted to make a contrary finding. In that action the plaintiff asked that the defendants be enjoined from diverting flood waters upon his lands and for an injunction restraining defendants from maintaining the ditch and flume through which said waters were diverted upon the plaintiff's said land, and for damages sustained by prior diversions of said flood waters upon plaintiff's land.

In that action, the opinion of the District Court of Appeal was written by Judge Myers, then a judge of the Superior Court of the County of Los Angeles, temporarily acting as a justice of the District Court of Appeal, and later chief justice of this court. In that decision, Judge Myers called attention to two lines of decisions in this state, the decisions in one group apparently ignoring those in the other group and no apparent attempt having been made to reconcile them. He then analyzes each group and concludes that the group in which the case of *Hughes* v. *Dunlap, supra,* belonged was based upon the sounder reasoning. He further

traced the history of actions for injunctions to restrain a violation of a common-law right and cited a number of English authorities upon the subject. From the history of this type of actions as set forth in a long line of cases from the English courts, cited in the opinion in the Farrell case, it was shown that the following rule had been clearly established in the courts of England: "If a plaintiff applies for an injunction to restrain a violation of a common-law right, if either the existence of the right or the fact of its violation be disputed, he must establish that right at law; but when he has established his right at law, . . . unless there be something special in the case, he is entitled as of course to an injunction to prevent a recurrence." Following the citations from these cases from the English courts, the opinion in the case of *Farrell* v. *City of Ontario, supra* [page 358] continues: "These decisions may be taken then as determinative of the proposition that, under the English common law as it stood in 1850, at the time it was adopted as the rule of decision in this state, 'if a plaintiff applies for an injunction to restrain the violation of a common-law right, if either the existence of the right or the fact of its violation be disputed, he must establish that right at law;' or, in other words by a jury, if one be demanded. We conclude, therefore, that the parties here were entitled to a jury trial upon the issues as to damages and that the verdict of the jury thereon was binding. We do not regard the provision of section 731 of the Code of Civil Procedure as in any way affecting that right. If the jurisdiction in law and equity were here separately vested, it might well be held that the plaintiff, by filing in equity a complaint such as is here presented, had thereby elected to submit *all* the issues for determination by the court, and thereby waived his right to a jury trial on the legal issues; but where, as here, all such issues may be tried in the one action, no reason for such holding appears."

The decision in *Farrell* v. *City of Ontario, supra,* was followed and approved only a few weeks later by the case of *Franklin* v. *Southern Pacific Co.,* 40 Cal. App. 31 [180 Pac. 76], in which likewise the judgment of the trial court was reversed. The decision in this later case was by the same court which rendered the decision in the case of *Farrell* v. *City of Ontario, supra.* A petition for a hearing after said

decision was denied by the Supreme Court. It is interesting to note that the author of the opinion in the first of these two cases, was the trial judge in the later case.

Neither of these cases has been cited in any later decision of this court on the question as to whether a party is entitled to a jury trial in an action like the instant case except in the decision of *Union Oil Co.* v. *Reconstruction Oil Co.,* 20 Cal. App. (2d) 170, 190 [66 Pac. (2d) 1215], which case will be referred to later. Neither has there been any decision of this court or of the District Court of Appeal to which our attention has been called holding that a party to an action like the instant one is not entitled as a matter of right to a jury when the question of damages is put in issue by the pleadings until the decision of this court in the case of *Bettencourt* v. *Bank of Italy etc. Assn.,* 216 Cal. 174 [13 Pac. (2d) 659]. In that case no reference or citation was made to either the Farrell or the Franklin cases, and the only authority cited in support of its ruling was the case of *McCarthy* v. *Gaston Ridge Mill & Min. Co.,* 144 Cal. 542 [78 Pac. 7], a case cited by Judge Myers in his opinion in the Farrell case and rejected by him as belonging to that group of cases which were not in accord with the earlier English decisions nor with *Hughes* v. *Dunlap, supra,* and other decisions of this court holding that in an action for an injunction to restrain a trespass upon real property and for damages for past trespass, the right of action for damages was a legal remedy to which the parties were entitled to a jury.

In our opinion, the argument and presentation of authorities cited by Judge Myers in his opinion rendered in the Farrell case, are unanswerable and the rule therein announced should be followed by the courts of this state in actions wherein both legal and equitable remedies are the subject of the action. In so far as the case of *Bettencourt* v. *Bank of Italy etc. Assn., supra.,* is contrary to the rule thus announced, it is overruled. It follows, therefore, that the trial court in this action committed error in denying the demand of the appellants for a jury to try the question of damages which the respondent sought to recover from the appellants.

The claim of the respondent that the demand of appellants for a jury was defective or insufficient because it

was general in its terms and did not specifically state that a jury was demanded to try the issue of damages only is, we think, without merit. The authorities cited in support of this claim do not sustain it. They simply hold where issues at law are involved with equitable issues, the trial court did not commit error in refusing to submit to a jury both the equitable issues as well as the issues at law. In this action the record shows that a jury was regularly drawn to try this action and at the commencement of the trial was present in court for that purpose. They were temporarily excused at the request of respondent's counsel in order to permit him to make certain motions in the absence of the jury. Whereupon respondent's counsel objected to the empanelment of the jury, and moved for its dismissal upon the ground that the action was an action in equity; that the legal relief sought was subordinate to the main equitable features of the action, and the only legal relief sought was a claim for damages. This objection of respondent was sustained, and an order was made dismissing the jury. No objection was made to the jury on account of any defect in the demand for a trial by jury, but the objection to the jury was made and sustained and a motion was made and granted for the dismissal of the jury on the ground that the action was one in equity and that the legal relief was subordinate to the main equitable features of the action. The reason, therefore, for the denial of appellants' demand for a jury to try the action was not that the demand was insufficient or in any manner defective, but that the action although brought to enforce both legal and equitable remedies was triable by the court alone, and that the appellants had no right to have a jury pass upon respondent's claim for damages.

Respondent further contends that even though the trial court may have committed error in denying appellants a jury trial upon the question of damages, nevertheless, the appellants were not prejudiced by this error for the reason that the facts disclosed by the record indicate not only that the respondent sustained damage by the acts of appellants and that the correct measure of damages was applied but no jury properly instructed could have returned a verdict in favor of appellants upon the question of damages. In the case of *Union Oil Co.* v. *Reconstruction Oil Co.*, 20 Cal.

App. (2d) 170, it was held that (page 190) [66 Pac. (2d) 1215], "In the instant action where the facts disclosed by the record indicate that the correct measure of damages was applied by the trial court and that in our opinion a jury properly instructed and properly performing its duty could have returned no other verdict than one favorable to respondent for the precise amount which was here awarded as damages, we are constrained to follow the rule announced in the former of the two above-noted groups of decisions and to declare that no error was committed by the trial court in refusing the demand of appellants for a jury trial on the issue of damages." We think this statement of the District Court of Appeal goes beyond the rule announced in the Farrell case in holding that no error was committed by the denial of the trial court of a jury to try the question of damages. We are of the opinion, however, that under the facts of the instant case this error was not prejudicial to the rights of the appellants. The facts of the case clearly show that appellants admittedly drilled their wells so that they passed beyond the boundary line of their land into and under the surface of the lands of respondent. In the first place the wells were located on the surface of appellants' land only a few feet from the boundary line of respondent's land. After the wells were drilled a comparatively short distance they were deliberately diverted towards respondent's land, and when they were completed they were hundreds of feet beyond the boundary line of appellants' land and into and under respondent's land. After the wells were drilled, large quantities of oil were extracted from the lands of respondent by these wells and appropriated by the appellants. No jury properly instructed and properly performing its duty could have returned a verdict that the respondent was not damaged by these acts of the appellants. As to the amount of damages which the respondent sustained by these acts of the appellants, there is no contest whatever. The court took the figures given by the appellants as to the amount and value of the oil which had been removed, deducting the amount of the royalty paid to the landowner which would have been payable in any event, and the appellants stipulated to the correctness of these amounts, thus in effect stipulating that if they were liable at all on account of the oil already removed, the amount was that which was in-

cluded in the judgment. In our opinion, no reversible error appears in connection with the refusal to submit the issues of this case to a jury.

■ Another point raised is that the evidence was insufficient to justify the rendition of a money judgment against the appellant, Sam Bernstein. It is contended that there is no evidence showing that this appellant participated in the acts of which the respondent complains. This statement is not correct. One witness testified that he visited parcel B with Sam Bernstein and that Sam Bernstein explained to him the plan to drill wells on parcel B in such a manner that they could cross the boundary line and bottom in and produce oil from parcel A. With this evidence in the record we are of the opinion that no jury could have failed to find that the appellant, Sam Bernstein, was equally guilty of the illegal acts charged against him and his associates.

■ We are in accord with the remainder of the opinion of the District Court of Appeal, and hereby adopt the same as a part of this opinion. It is as follows: "It is next urged that the court erred in not compelling the respondent as a prerequisite to injunctive relief to reimburse the appellants for all moneys expended by them in connection with the drilling of wells upon parcel B. This is based upon the contention that since the respondent was asking for equitable relief it should be ordered to do equity; that the wells on parcel B were drilled by the appellants with the knowledge and tacit consent of the respondent and, therefore, the respondent should be barred from equitable relief by the principles of estoppel and laches; and that the appellants were entitled to such reimbursement under the provisions of section 349¾ of the Code of Civil Procedure, which section was adopted after this action was begun.

"The act adopting section 349¾ (Stats. 1935, p. 2285) contained a declaration of policy declaring that there are many oil and gas wells in this state which are not wholly within the land owned or controlled by the owners or operators of the wells, that until recent years there was no way to determine even approximately the subsurface location of the well, and that in many cases such wells were drilled without any intent to invade the land of another. It fully appears that this section was not intended to have any application in a case where a well is intentionally diverted

into the land of another. In the instant case it fully appears that the respondent retained all rights given by its original lease in so far as parcel A is concerned and it not only appears that the appellants' lease applied only to parcel B but the court found upon ample evidence that the appellants well knew that the productive pool of petroleum oil underlying parcel A did not extend to or underlie parcel B and that they intentionally, secretly and fraudulently employed the right to occupy the surface of parcel B for the purpose of accomplishing a clandestine and secret penetration of the oil pool underlying parcel A and the removal therefrom of oil, well knowing that this oil was the property of the respondent. Under such circumstances the appellants were chargeable with the value of the oil without any deduction for expenses incurred in bringing it to the surface. (*Lightner Min. Co.* v. *Lane,* 161 Cal. 689 [120 Pac. 771, Ann. Cas. 1913C, 1093].) Under such circumstances the appellants had no equities and may not rely upon the equitable rule that he who seeks equity must do equity. (*Hibernia Sav. & L. Society* v. *Ordway,* 38 Cal. 679; *Richmond* v. *Bank of Perris,* 102 Cal. App. 71 [282 Pac. 801].)

 ''Nor is there any room here for the application of the principles of laches or estoppel as against the respondent. The appellants contend that the respondent knew what was being done and tacitly consented thereto because this proceeding was not begun for several months. Drilling was begun on the first of the three wells on May 17, 1933, and the well was completed on June 20, 1933. When a representative of the respondent inquired as to whether this well was being whipstocked he was told by the appellants they were trying to keep the well straight. After that well was completed the respondent was told that the bottom of the well was within parcel A but was not told that this had been intentionally done. The second well was started August 10, 1933, and completed September 14, 1933, and the third well was begun on November 24, 1933, and completed on January 16, 1934. No information as to the underground location of these wells came to the respondent until after the respective wells were completed and there is evidence that surveys and reports were intentionally kept from the respondent. The respondent had no information as to the underground location of the second and third wells until

after March 20, 1934, when through a grand jury investigation surveys and reports were secured. There was no estoppel both because the respondent did not possess full information prior to or during the drilling of the wells and because the facts were fully known to the appellants, who were intentionally and secretly proceeding against the property of the respondent, and they were in no way or manner deceived or misled by anything done by the respondent.

While the respondent learned after its completion that the first well penetrated their land it was not informed that this had been intentionally done or that there was any intention to do the same thing as the second and third wells were drilled. Since it was refused access to surveys and reports it became necessary for the respondent to ascertain the facts and to procure evidence in other ways. Not only would this take considerable time in view of the natural difficulties involved in obtaining such evidence, but the respondent was justified in taking steps to be very sure of the facts before proceeding with a charge of this nature. This action was begun on July 17, 1934, and it cannot be held as a matter of law that the trial court erred in failing to find that the respondent was guilty of laches which would bar relief.''

For the reasons given, the judgment is affirmed.

Edmonds, J., Langdon, J., Waste, C. J., Houser, J., Shenk, J., and Seawell, J., concurred.

Rehearing denied. Langdon, J., voted for a rehearing.