[Civ. No. 3206. Fourth Dist. Feb. 10, 1943.]

ELIZABETH DOLCH, Appellant, v. M. G. RAMSEY, Respondent.

Duckworth, Mussell & King for Appellant.

James L. King for Respondent.

MARKS, J.—This is an appeal from a judgment refusing plaintiff damages for gold ore wrongfully taken by defendant from a patented mine owned by plaintiff.

The parties are in substantial agreement on the law governing the case. They agree that the applicable rule is correctly stated in 17 Cal.Jur. 540, section 182, as follows:

"The measure of damages in an action for trespass on a mining claim, in the absence of oppression, fraud or malice, is the amount which will compensate for all the detriment proximately caused by the trespass. Accordingly, where one invades another's mine as the result of inadvertence or an honest mistake, the measure of damages therefor is the value of mineral extracted, less the cost of mining and milling. . . . Where the trespass is intentionally committed, with knowledge of the owner's rights, the measure of damages is the value of the mineral after reduction, without deducting the expenses of mining and milling.'' (See *Lightner Mining Co.* v. *Lane,* 161 Cal. 689 [120 P. 771, Ann.Cas. 1913C, 1093]; *Pacific Western Oil Co.* v. *Bern Oil Co.,* 13 Cal.2d 60 [87 P.2d 1045]; *Union Oil Co.* v. *Reconstruction Oil Co.,* 20 Cal.App.2d 170 [66 P.2d 1215].)

It is undisputed that defendant removed 212 tons of ore from the property. Fifty tons, which had been previously mined, were taken from a dump and the balance was mined by defendant from an old ·tunnel and drift. It is also undisputed that defendant sold the concentrates from this ore for $2,979.32; that the mining expense was $3,034.51, and the milling, concentrating and selling costs were $1,507.27, resulting in a net loss to defendant of $1,562.46.

The trial court found: ''That the defendant, M. G. Ramsey, did on or about December 5, 1940, enter upon said premises in good faith and believing that said premises were open for location and without any knowledge of any other claim thereon and thereto and for a period of approximately six months thereafter performed work openly upon said premises and did remove ore therefrom as hereinbefore found. That the said defendant, in so doing, acted without oppression, fraud or malice and as a result of inadvertence and an honest mistake and without any knowledge of the ownership of plaintiff.''

The sole question for decision is whether the evidence, or reasonable inferences to be drawn from it, supports the foregoing finding. If so, the judgment for defendant must be affirmed. If the contrary is true it must be reversed.

The claim was properly located by plaintiff's husband, since deceased, in 1897. It was again located by plaintiff. These parties built a road to the property and conducted mining operations. They made cuts, sank a shaft and drove a tunnel 154 feet long into the mountain. They removed ore and plaintiff's son who had worked on the property testified that gold had been recovered and sold. He did not know the amount nor its value.

Plaintiff applied for a patent in 1939. A patent, dated February 6, 1940, was issued to her and was recorded on October 21, 1940.

The engineer who surveyed the property in November, 1937, as a preliminary to the application for a patent, set 4x4 inch corner posts that extended about four feet above the surface of the ground. These were originally painted white.

At the time defendant first went onto the property, and during all of his operations, these corner posts were in place and were plainly marked V-1, V-2, V-3 and V-4, and had the number of plaintiff's patent on them. To perpetuate the

locations the surveyor blazed three witness trees near three of these corner posts with the same information on them. He also placed a stake near one of the corner posts. Attached to this stake was a board upon which was fastened a map of the mine. This map carried the information that a patent had been applied for and had been issued. The heavy paper carrying the map had dimensions of about 14 by 20 inches. The map and the certificate of the cadastral engineer were printed in black ink and were surrounded by a conspicuous black border. From a photograph in evidence it was plainly visible to anyone who would look for it.

It is admitted that the terrain was rough and covered with scattered brush and that there were some trees growing on the property. Defendant admitted that one of the corner stakes was clearly visible from a road he built into the mine. He admitted having seen this stake. He made no investigation of it and claimed it conveyed to him no suggestion that the property might be claimed by another. He also admitted that another corner stake was visible from near the dump although he denied having seen it prior to the time he was advised of plaintiff's ownership of the property. He produced a picture which he had taken from near the dump on which this stake clearly appears. The conclusion is inescapable that had he looked from a position near the dump towards this corner stake he must have seen it.

Defendant had been connected with mines and mining for several years. He had operated two leased mining claims and had helped locate another claim. He had owned and operated his reduction plant for several years. It had a capacity of fifty tons of ore a day and was situated less than a mile from plaintiff's mine. He had lived near this plant for several years.

He testified that he first went onto plaintiff's property on December 4, 1940; that he saw the old workings and the discovery monument. He returned the next day with Arthur May, his mining foreman. They found an old rusted can in the discovery monument. It contained the original location notice signed by Edward Dolch in 1897, another signed by Mr. and Mrs. Dolch and Ole E. Rossen, and a third by Mrs. Lizzie Dolch. The can also contained the following:

"NOTICE

"Notice of Exemption from Assessment work on this claim for year 1936-1937 has been filed with County Recorder at San Bernardino.

Mrs. Edward Dolch<br>(By M. Law)"

Arthur May prepared a new location notice in which he copied the description from the Dolch notice. It was signed by defendant and returned to the can with the other papers and placed in the discovery monument. A duplicate was recorded.

Ramsey testified that no monuments were erected by him or for him; that "we assumed the previous locator would have those up." He also testified that he did not look for the corner or side monuments but merely saw the discovery monument. He further testified:

"I saw this one post, number '3', from the road, but I didn't see any sign on it, and didn't know what it was, and didn't know what it represented. Q. Was it the only post that came under your observation during your observations there? A. As far as I remember. I don't remember seeing any other post; it would have made little difference; the only thing I went by was the location monument where the can was. Q. After discovering or finding the contents of this can, with the location notices, the last one of which was apparently in 1939, did you attempt to find any other location notices, or any other monuments of any kind? A. No; not to search for any monuments; we didn't look for any other monuments. Q. You depended entirely upon what you found in the can in the location monument? A. That is right. Q. Did you at any time ever go over and examine and look closely at this post number '3', that you stated you noticed, going by? A. No; just saw it from a distance. Q. Did you at any time see any of the other posts—'1A', '2', or '4'? A. Not that I recall. I might have passed by them; but I wouldn't have known what they represented if I did see them."

Defendant built a road into the property which ran within about fifty feet from the corner post he admitted having seen. He moved machinery in and commenced his mining operations, employing three or four men in this work. On June 7, 1941, he was informed that he was working on a

patented mine belonging to plaintiff. He immediately moved off from the property.

The finding to the effect that Ramsey entered and worked the property in good faith, believing that it had been abandoned and was open for location, was based upon the general appearance of the workings which were old and delapidated and on his testimony, as follows:

"Q.. Now, Mr. Ramsey, at the time that you first went on this property and posted your notice or claim in the can and filed the notice of claim in the Recorder's office, did you at that time have any information or knowledge that anybody else had any claim to or claim on the property which you later worked on, and which you now know as Dolch's property? . . . A. I had no knowledge that it was patented, or that anyone had a claim on it. . . . Q. Did you at any time during the period that you operated on the property, from December 5th, approximately, 1940, to when you discontinued, about June 7th, 1941—did you at any time have any knowledge or information that anyone else had any claim to or ownership in the property? . . . A. I didn't know it was patented or that it was claimed by anybody at any time that I was on there."

This question is now presented: Does this evidence support the finding of the trial court of good faith on Ramsey's part when undisputed evidence shows that had he used the slightest diligence or had he obeyed the law in making his location he would have discovered that the property was patented and that Mrs. Dolch was the lawful owner of it?

Section 2302 of the Public Resources Code provides as follows:

"The locator or locators of any lode mining claim shall define the boundaries of the claim so that they may be readily traced, but in no case shall the claim extend more than fifteen hundred feet along the course of the vein or lode, nor more than three hundred feet on either side thereof as measured from the center line of the vein at the surface. Within sixty days after date of location of any lode mining claim hereafter located, the locator or locators shall erect at each corner of the claim and at the center of each end line, or the nearest accessible points thereto, a post not less than four inches in diameter, or a stone monument at least eighteen inches high."

If, as Ramsey testified, the description in his location no-

tice was copied from the Dolch location notice, the boundaries and corners of the two locations would be identical. He was required by law to erect corner posts or monuments in making his location. If he had done so he would have discovered the corner posts of the patented mine, the witness trees with their markings and the map of the mine, all bearing the information that a patent had been issued to plaintiff.

His belief that the mine had been abandoned and was open to location was his own conclusion, not based on what was in plain sight (the two corner posts), nor on what he could have discovered by the use of reasonable diligence, and on what he failed to discover by reason of his failure to obey the law in making his location. We believe that his good faith should be measured, not entirely by the words he used in testifying, but by those words when weighed in the light of information easily available to him and the reasonableness of his conclusion when measured by what was in plain sight and what he could have learned by the use of his natural senses and the employment of reasonable prudence. ▪ A person may not have actual knowledge of certain facts, but if he has knowledge of sufficient facts to cause a reasonably prudent person of ordinary intelligence to make inquiry, the law will impute knowledge of those facts which may be easily ascertained by reasonable inquiry. When the law imputes knowledge, it has the same legal effect as though there was actual knowledge.

The rule is thus stated in *Sterling* v. *Title Ins. & Trust Co.*, 53 Cal.App.2d 736 [128 P.2d 31], at page 748:

"A common situation is one where conflicting property rights are involved, and of these Mr. Pomeroy says (Pomeroy's Equity Juris., vol. 2, 4th ed., p. 1154, § 608), 'Whenever a party has information or knowledge of certain extraneous facts, which of themselves do not amount to, nor tend to show, an *actual* notice, but which are sufficient to put a reasonably prudent man upon an inquiry respecting a conflicting interest, claim, or right, *and the circumstances are such that the inquiry, if made and followed up with reasonable care and diligence, would lead to a discovery of the truth,* to a knowledge of the interest, claim, or right which really exists, then the party is absolutely charged with a constructive notice of such interest, claim, or right.' "

See, also, *Nicholson* v. *City of Los Angeles,* 5 Cal.2d 361

[54 P.2d 725]; *West* v. *Great Western Power Co.*, 36 Cal. App.2d 403 [97 P.2d 1014]; *Price* v. *Mason-McDuffie Co.*, 50 Cal.App.2d 320 [122 P.2d 971].

Defendant had knowledge that the property had been located as a mining claim by others; that the prior locator had claimed it as late as 1937; that at least one corner post was in place. As we have observed, had he obeyed the law and erected corner posts when he attempted to locate the property he would have found that the mine was patented and belonged to plaintiff. However, he preferred to rest on the appearances of the workings which conveyed the impression that the mine had not been worked for a considerable time. His conclusion that the claim had been abandoned rested on this one fact. As he was a mining man of several years experience he should have known of the several mining moratorium acts of Congress which excused assessment work by those taking advantage of them. He had actual notice that plaintiff had taken advantage of one of them. Thus he knew or should have known that assessment work on the mine might have been excused for several years. Thus his conclusion that the claim, because of its dilapidated condition with no sign of recent work, had been abandoned, rests upon a most unsubstantial foundation. The conclusion seems inescapable that a man of ordinary intelligence and common prudence would have been warned by these facts within his knowledge and would have investigated the ownership of the property before spending $4,541.78 on it and removing ore of the value of $2,979.32 which was actually the property of another and to which he had no right.

We must hold that defendant had constructive notice that the claim had been patented and belonged to plaintiff; that he was a trespasser when he went on the property and removed gold ore that belonged to another. Under these circumstances he did not act in good faith without knowledge that the mine was the property of another. Under such circumstances he was liable for the value of the gold he took, without any deduction for his expenses in wrongfully taking it. (*Lightner Mining Co.* v. *Lane, supra.*)

The case of *Benson Mining and Smelting Co.* v. *Alta Mining and Smelting Co.*, 145 U.S. 428 [12 S.Ct. 877, 36 L.Ed. 762], is factually similar to the instant case. In 1879, Harshaw, and others, made application to the Land Office for a patent to the Alta Mine and paid into that office the amount

required for that purpose and received a certificate of purchase. Thereafter they sold the mine to the plaintiff which worked it until 1882, during which year it did no assessment work thereon. In 1883, J. K. Luttrell, believing the claim abandoned because of the failure to do assessment work, located the mine, took possession and worked the property. The patent was issued to Harshaw and his associates in January, 1884. Plaintiff, as successor to Harshaw and his associates, sued for the value of the gold removed from the mine.

The Supreme Court held that the application for the patent and the acceptance of the purchase price by the United States made Harshaw and his associates the equitable owners of the mine and that thereafter no assessment work was necessary; that under these circumstances the belief of Luttrell that the claim had been abandoned because no assessment work was done in 1882 could not excuse the unjustified trespass.

On appeal the defendant urged that it should have been credited with its costs in mining the ore. This claim was rejected by the court. A similar conclusion was reached by the Ninth Circuit Court of Appeals in *Big Sespe Oil Co.* v. *Cochran*, 276 F. 216.

Defendant urges that the judgment should be affirmed because plaintiff was not damaged, since the cost of mining and reducing the ore was much greater than its value. This argument is without merit. It has been repeatedly held in many jurisdictions, including California, that under the circumstances here, the value of the minerals taken, without deduction for the cost of taking, furnish the correct measure of damages which, to that extent, are in the nature of a penalty for the wrongful trespass. This sufficiently appears in the cases already cited.

Defendant relies strongly on the case of *Lightner Mining Co.* v. *Lane, supra,* as supporting the judgment. A study of that case leaves the conclusion that defendant can get no support from it. The plaintiff brought the action to recover the value of gold ore taken from its mine. The jury returned a verdict awarding the plaintiff the full value of the ore without any deduction for the mining costs. The Supreme Court reduced the judgment by the amount of those costs. It found the evidence sufficient to show fraudulent taking and fraudulent concealment of the taking of the ore by the employees of the defendants without their knowledge

or consent and without any ratification on their part. The reason for the reduction of the judgment was summarized as follows:

"It is the settled law of this state that exemplary damages cannot be given against a principal for the fraud of the agent, unless the principal either had knowledge of the fraud at the time, or authorized it, directly or by implication, or ratified it after it came to his knowledge."

In the instant case defendant can claim no such exemption from liability because of ignorance. The mining was done under his direction. He knew the ore he received, reduced and sold, came from the mine although he may not have personally engaged in mining it.

The judgment is reversed.

Barnard, P. J., and Griffin, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied April 1, 1943. Edmonds, J., Carter, J., and Schauer, J., voted for a hearing.