[No. F015045. Fifth Dist. July 13, 1993.]

ARCIERO RANCHES, Plaintiff and Respondent, v.
AMADOR R. MEZA et al., Defendants and Appellants.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part I.

COUNSEL

Ronald U. Carter for Defendants and Appellants.

Cantor & Weinshenk and Stanley A. Zamel for Plaintiff and Respondent.

OPINION

**ARDAIZ, Acting P. J.**—On July 29, 1987, plaintiff and respondent, Arciero Ranches (Arciero) filed a verified complaint alleging that defendants and appellants Amador Meza, Raquel Meza, and Does 1 through 100 had willfully trespassed, and would continue to trespass, on a certain road (the farm road) located on the Brothers Ranch in Kern County and owned by Arciero. Arciero sought, inter alia, a permanent injunction enjoining each defendant from entering the Brothers Ranch or removing any barriers located thereon. Arciero also sought both compensatory and exemplary damages. On August 19, 1987, the complaint was amended to include Pedro Meza as a defendant.

Defendants and appellants (the Mezas) filed their answer to the complaint on March 17, 1988.[1] In it, they generally and specifically denied the allegations contained in the complaint and, as affirmative defenses, asserted that they had obtained a prescriptive easement which allowed them to travel on the farm road and further, that Arciero's claim was time-barred under Code of Civil Procedure sections 318, 319, and 320.[2]

The Mezas also filed a cross-complaint alleging that they had obtained a prescriptive easement in the roadway and that Arciero had wrongfully interfered with their lawful right to use said easement. They asked the court to declare them owners of the prescriptive easement and to quiet title accordingly. In addition, the Mezas sought monetary damages, both compensatory and punitive, as well as a temporary restraining order and injunctions, preliminary and permanent, enjoining Arciero from interfering with the Mezas' allegedly lawful use of the easement.

Arciero timely filed its answer to the cross-complaint admitting it was the owner of the subject property but otherwise denying each and every allegation contained in the cross-complaint.

The matter was set for jury trial on June 25, 1990. For some undisclosed reason, the trial was continued until July 9, 1990.

---

[1] The record does not reflect the date the complaint was actually served on appellants.
[2] All statutory references are to the Code of Civil Procedure unless otherwise indicated.

On the day set for trial, a discussion ensued between the court and counsel regarding bifurcation of the legal and equitable issues. After hearing argument from both counsel, the court ruled that the Mezas had no right to a jury trial on the equitable issues and ordered that they be heard by the court prior to resolution of the legal issues.

Both parties presented testimonial and documentary evidence in support of their respective positions on the issues declared by the court to be equitable in nature. After both sides concluded their respective cases and presented oral argument, the court took the matter under submission.

On August 30, 1990, the court notified the parties of its intention to find that the Mezas "did not acquire a prescriptive easement in the property of [Arciero] as they were unlawfully using the land after the removal of fences and obstacles placed on the land by [Arciero]." Neither party requested a formal statement of decision as provided for in section 632.[3]

Pursuant to the court's order, Arciero prepared the judgment in Arciero's favor as well as the proposed permanent injunction enjoining the Mezas from entering certain portions of the Brothers Ranch and removing any barriers thereon. The judgment and permanent injunction were signed by the court on October 4, 1990, and entered on October 8, 1990. Notice of entry of judgment was served by Arciero on October 16, 1990.

Amador R. Meza and Rachel Meza filed their notice of appeal on December 4, 1990.[4] On appeal, the Mezas contend the trial court erroneously denied their right to a trial by jury, misapplied the law regarding prescriptive easements and committed prejudicial error when it overruled the Mezas' objection to the admission of evidence concerning alternate routes available to the Mezas that would provide access to their property. The Mezas maintain that the court should have found, as a matter of law, that they obtained a prescriptive easement in the farm road. We reverse the judgment of the trial court.

## FACTS

Frank Arciero and others first acquired the property known as the Brothers Ranch in 1973. With the exception of one area not relevant to the present

---

[3]Section 632, in relevant part, provides: "In superior . . . courts, upon the trial of a question of fact by the court, written findings of fact and conclusions of law shall not be required. The court shall issue a statement of decision explaining the factual and legal basis for its decision as to each of the principal controverted issues at trial upon the request of any party appearing at the trial. The request must be made within 10 days after the court announces a tentative decision . . . ."

[4]Pedro Meza did not file a notice of appeal.

case, the perimeter of their newly acquired property was fenced using metal posts and chicken wire topped with two strands of barbed wire. The fence was installed to prevent people from inadvertently entering the Arciero property.

Mr. Arciero testified that the farm road did not exist when Arciero first purchased the property. However, as they began to develop the property, Arciero realized the importance of having a road in that location; thus, the farm road was developed to run in an east-west direction in the approximate center of section 13 so as to connect Cantil Road with the eastern boundary of Arciero's property.

In either 1976 or 1977, Frank Arciero placed six-inch diameter steel posts filled with concrete on both sides of the farm road where it intersects with Cantil Road on the western boundary of his property. These posts, connected by a single cable with a locking mechanism, were used to close the road whenever the area was being farmed.[5] At this time, a fence was the only means used to prevent access from the eastern end of the farm road.

Mr. Arciero testified that, from 1973 to 1981, no one, save employees of the ranch, was given permission to use the farm road. Amador Meza worked for Arciero regularly, but intermittently, during these years.[6] As such, he was given permission to use the road while employed by Arciero.

Mr. Anderson, Brothers Ranch foreman during this time period, and Mr. Perez, foreman for a nearby Arciero ranch, both testified that they had seen "the Mezas" using the farm road in "1979 and 1981," but also indicated that it was not the primary route used by the Mezas to get to their property.[7] Mr. Perez said that he had seen the Mezas use a third route as well.

Mr. Anderson indicated further that the fence at the eastern end of the farm road was torn down a "number of times" during the same time period and, once discovered, repairs were promptly made.

Sometime in the early '80's, Mr. Arciero noticed "weekenders" staying on some nearby property but did not concern himself with them since they did not travel across his property in order to gain access to theirs.

---

[5] According to Mr. Arciero, the property was continuously farmed from 1973 until Arciero sold the ranch to Butte in 1981. It was also planted in 1986. The property was used to grow alfalfa but Mr. Arciero did not say how long it takes from planting time to harvest. He did indicate that alfalfa was not grown in the winter but would be growing between May and July.

[6] Mr. Meza testified that he thought that he worked for Arciero in the late 1970's. In response to the next few questions posed to him at trial, he indicated that he worked at the Brothers Ranch during "those years" but later said that he only worked for Arciero for a few months.

[7] Although somewhat later during trial, Mr. Anderson, the Brothers Ranch foreman at the time, said that he never saw Mrs. Meza or the Meza children driving on the farm road.

In early to mid-July 1981, Arciero sold all of its real property holdings in the area, including the Brothers Ranch, to Butte Oil and Gas and Farming (Butte). Pursuant to the sales agreement, Arciero held the promissory note on the property, which was secured by a deed of trust. At the time of the sale, the lock and cable used to close the western end of the farm road were still intact.

Butte maintained Arciero's policy of only allowing employees to use the farm road. Amador Meza was employed by Butte on several different occasions, but Mr. Anderson, who was now employed by Butte as manager of all the ranches, could not recall the exact dates of his employment.[8] According to Mr. Perez, an employee of both Arciero and Butte, the Mezas continued to use the farm road on a near daily basis during the time Butte owned the property in question. However, Mr. Anderson testified that the road running along the railroad was the primary route used by the Mezas.

Mr. Arciero went to the property on two or three occasions after Butte began falling behind in its payments. Other than the presence of a large number of tumbleweeds, he did not notice anything unusual about the condition of the property. Everything, including the fencing, was intact. On one such occasion, he noticed the locked cable being used to block access to the farm road.

Frank Arciero first noticed the Mezas living on some nearby property in 1985.

In late August of 1985, with Butte approximately one year behind in its payments, Arciero foreclosed on the deed of trust and reacquired the property. Inspection of the property revealed that, for the first time in Arciero's ownership of the Brothers Ranch, some of the fencing at the east end of the farm road had been taken down.

Mr. Arciero directed his foreman to repair the fence and to place rocks in front of the damaged portion to prevent trespassers from entering his property. He also told his foreman to sink some posts in the area and post "no trespassing" signs. The foreman complied with his request, and the following week Mr. Arciero personally inspected the work.

However, around September or October of 1985, Mr. Arciero returned to the area and found that all but one of the signs had been removed. When they returned to the area at a later date, they found the fence torn down. The

---

[8]Mr. Meza stated that he worked for Butte at the Brothers Ranch, but did not specify the dates of his employment.

fence was repaired, but every week that they returned to the area, they found the fence torn down.[9]

When Mr. Arciero learned of the damage, he tried to contact those he believed to be responsible by going to their mobile home. There, he contacted two young men, one of whom identified himself as the Mezas' son, and told them that he did not want them trespassing on his property. He asked the young Meza to have his father contact him.

The Mezas' son was displeased with the news. In fact, one of the two men (the record doesn't indicate which one) told Mr. Arciero that someone was going to get hurt if the road was closed. Mr. Arciero told them to forget it; that it was not worth anyone being hurt. This was the only time Mr. Arciero spoke with anyone in the Meza family regarding their use of the farm road. Towards the end of 1986, after the rock pile had been removed for the second time, Mr. Arciero consulted legal counsel which resulted in the present action being filed.

*Defense*

Amador Meza testified that he began making payments toward the purchase of lots 4 and 9 located in section 18 in 1976. He and his family moved into existing buildings on the property in 1977 and continued to live there until April of 1990 when they moved to California City. Mr. Meza acknowledged that his work would occasionally require that he be away from the family home. At the time of trial, Mrs. Meza said they spent two days per week at their Cantil property (presumably to care for the horses they left behind).

Mr. Meza maintains that he and his wife have consistently used the farm road to travel to and from his property since moving there in 1977. To their knowledge, the farm road was the only access road available to them. Mr. Meza insisted that he never used any of the alternate routes described by other witnesses.

From 1977 to 1985, Mr. Meza testified, the western end of the farm road was not blocked in any way. He also testified that, from 1977 to 1985, there was never a fence between the two posts at the eastern end of the farm road (depicted in defendants' exhibits G and J). Mr. Meza claimed to have

---

[9]Mr. Arciero testified later that a portion of the fence on his property, indicated by a green "x," was repaired *only two to three* times. Unfortunately, the document with the green "x" was not made a part of the record on appeal. As a result, we cannot determine whether this testimony contradicted his earlier testimony.

had a well drilled on the property in 1981 and that the well driller utilized the farm road to get to his property. In 1983, Mr. Meza purchased a small trailer and moved it to his property via the farm road.

Mr. Meza seemed to imply that sometime after 1985 a cable was strung across the western end of the farm road. Between 1986 and 1987, Mr. Meza said Arciero constructed a fence at the eastern end of the farm road using railroad ties. Mrs. Meza indicated that the farm road was completely free of any obstructions until this barrier was erected on the farm road in 1987.

Mr. Meza personally removed the railroad tie barrier. Arciero countered by placing "two dumpster trucks of rocks" in the same area. Mr. Meza removed some of these rocks by hand to create a path wide enough for his vehicle to pass.

Mr. Meza said that Mr. Arciero met with Mrs. Meza and informed her that her family could no longer use the farm road. Mr. Meza said he contacted Mr. Arciero by phone to discuss the problem and that Mr. Arciero had told him that so "long as it's you, I don't mind. If you ever sell the property, I don't want anyone else to be entitled to use my road."

Yet, a few months after the rocks had been removed, Mr. Meza was served with the summons and complaint in the present lawsuit.

Mr. Meza never asked permission to use the farm road because he thought it was a public road. He based this conclusion on the fact that this was the route used to take him to look at the property he ultimately purchased. Further, no one had tried to stop him from using the farm road until *1985* when the barrier was constructed at the eastern end of the road.

Armando Ravera, Mr. Meza's stepson, also testified during trial. He claims to have lived with the Mezas since they moved to the Cantil area in 1977. He stated that members of his family have used the farm road on a regular basis to access their property. Mr. Ravera got his driver's license in 1976 and said that he, personally, used the farm road when entering or leaving the Meza property.

Mr. Ravera claimed that, from 1981 through 1985, someone in his family would make at least four trips on the farm road every day of the week. He did not, however, delineate the number of times each member of the family used the road. This pattern of daily use continued throughout 1987, although his father would usually only come home on the weekends.

Mr. Ravera testified that nothing obstructed the eastern end of the farm road until the railroad ties were put in place in either late 1986 or early 1987.

After he helped to disassemble the railroad tie blockade, another attempt was made to block the road—this time by placing large piles of rock in the roadway. He helped remove this barricade as well.

Mr. Ravera admitted that Messrs. Arciero and Madrid contacted him "[r]ight after the second time" and that Mr. Arciero had informed him that they could no longer use the road to access the Meza property. He told Mr. Arciero that the farm road was the only road he knew of that he could use to get to his property and further, that he fully intended to continue using the road despite any attempts Mr. Arciero might take to block the road. They argued briefly before each of them went on their way with Mr. Ravera using the farm road.

Finally, the Mezas presented evidence to show the farm road existed as early as 1965—contrary to Mr. Arciero's testimony. Civil engineer and land surveyor Callagy testified that defendant's exhibit I (a United States Geological Survey map of the subject area created in 1965) shows the farm road existed as an unimproved dirt road at the time of the map's creation. The county executive director for the United States Agricultural Stabilization and Conservation Service, using an aerial photograph of the area taken in January 1973 (defendant's exhibit "L"), identified a dirt road running through the center of section 13 and connecting with Cantil Road. This testimony was also inconsistent with Mr. Arciero's testimony regarding the creation of the farm road.

## DISCUSSION

Initially, appellants claim they were denied their constitutional right to have a jury decide whether they had obtained a prescriptive easement in the farm road. Respondent contends that they had no such right and presents two arguments in support of its position. We shall first address respondent's argument regarding waiver of the right to a jury trial.

I

*Respondent Waived Its Right to Complain of Appellants'*
*Untimely Posting of Jury Fees\**

. . . . . . . . . . . . . . . . . . . . . . . . . .

*\*See footnote, ante, page 114.

II

*Appellants Had a Right to Have a Jury Decide Whether a Prescriptive Easement Exists in Their Favor*

■ Initially, appellants claim they were denied their right to have a jury decide whether they had obtained a prescriptive easement in the farm road. Appellants' argument is really twofold. First, they contend that the establishment of a prescriptive easement is a condition precedent to the granting of injunctive relief. Second, they maintain that the determination as to the existence of a prescriptive easement is an issue of law thus entitling them to a jury trial on the issue. Respondent, on the other hand, insists that this issue can be decided in the first instance in an equitable action and that, therefore, appellants had no right to a trial by jury on the issue. Resolution of this dispute can only be accomplished through a historical analysis of the right to trial by jury.

■ Article I, section 16 of our Constitution guarantees litigants the right to a jury trial. This right, however, is not without limitation. "In California, the constitutional right to jury trial in civil cases is coextensive with the right as it existed under the common law of England in 1850, when the California Constitution was adopted." (*Hung* v. *Wang* (1992) 8 Cal.App.4th 908, 927 [11 Cal.Rptr.2d 113].) As explained by our Supreme Court in *People* v. *One 1941 Chevrolet Coupe* (1951) 37 Cal.2d 283 [231 P.2d 832]: " ' "The right of trial by jury shall be secured to all, and remain inviolate." [Citation.] The right to trial by jury guaranteed by the Constitution is the right as it existed at common law at the time the Constitution was adopted. [Citation.] . . . The common law respecting trial by jury as it existed in 1850 is the rule of decision in this state. [Citation.] . . . It is the right to trial by jury as it existed at common law which is preserved; and what that right is, is a purely historical question, a fact which is to be ascertained like any other social, political or legal fact. The right is the historical right enjoyed at the time it was guaranteed by the Constitution. It is necessary, therefore, to ascertain what was the rule of the English common law upon this subject in 1850.' " (*Id.*, at pp. 286-287; accord, *Frahm* v. *Briggs* (1970) 12 Cal.App.3d 441, 444 [90 Cal.Rptr. 725]; *Hung, supra,* 8 Cal.App.4th at p. 927; *Escamilla* v. *California Ins. Guarantee Assn.* (1983) 150 Cal.App.3d 53, 57 [197 Cal.Rptr. 463]; *Interinsurance Exchange* v. *Savior* (1975) 51 Cal.App.3d 691, 693 [124 Cal.Rptr. 239].)

" 'In determining whether the action was one triable by a jury at common law, the court is *not bound by the form of the action but rather by the nature of the rights involved* and the facts of the particular case—the gist of the

action. A jury trial must be granted where the gist of the action is legal, where the action is in reality cognizable at law.' " (*People* v. *One 1941 Chevrolet Coupe, supra*, 37 Cal.2d at p. 299 (italics added); accord, *Frahm, supra*, 12 Cal.App.3d at p. 299.) On the other hand, equitable issues are to be resolved by the court sitting without a jury. (E.g., *Abbott* v. *City of Los Angeles* (1958) 50 Cal.2d 438, 462 [326 P.2d 484]; *Escamilla, supra*, 150 Cal.App.3d at p. 57.) "[W]here legal and equitable issues are joined in the same action the parties are entitled to a jury trial on the legal issues." (*Robinson* v. *Puls* (1946) 28 Cal.2d 664, 665-666 [171 P.2d 430]; accord, *Connell* v. *Bowes* (1942) 19 Cal.2d 870, 871 [123 P.2d 456]; *Pacific Western Oil Co.* v. *Bern Oil Co.* (1939) 13 Cal.2d 60, 66-69 [87 P.2d 1045]; *Thomson* v. *Thomson* (1936) 7 Cal.2d 671, 681 [62 P.2d 358, 117 A.L.R. 1]; *Hughes* v. *Dunlap* (1891) 91 Cal. 385, 388 [27 P. 642]; *Medeiros* v. *Medeiros* (1960) 177 Cal.App.2d 69, 72-73 [1 Cal.Rptr. 696]; *Farrell* v. *City of Ontario* (1919) 39 Cal.App. 351, 354-355 [178 P. 740].) Ordinarily, "the equitable issues are [to be] tried first and then, if any legal issues remain, a jury may be called." (*Connell, supra*, 19 Cal.2d at p. 872; accord, *Thomson, supra*, 7 Cal.2d at p. 683; *Angus* v. *Craven* (1901) 132 Cal. 691, 699 [64 P. 1091]; *Bank of America* v. *Ryan* (1962) 207 Cal.App.2d 698, 707 [24 Cal.Rptr. 739]; *National Electric Supply Co.* v. *Mount Diablo Unified School Dist.* (1960) 187 Cal.App.2d 418, 422 [9 Cal.Rptr. 864], and cases cited therein.)

The case currently before us presents both equitable and legal issues. Respondent's complaint presents two rights of action which, if proven, would entitle it to two remedies—the legal remedy of damages for past trespasses as well as the equitable remedy of injunction to prevent their reoccurrence in the future. (See *Farrell* v. *City of Ontario, supra*, 39 Cal.App. at p. 354; cf., *Hughes* v. *Dunlap, supra*, 91 Cal. 385, 388-390.) Appellants, by way of their cross-complaint, also seek both monetary and injunctive relief. In a cause of action seeking to quiet title, appellants have also asked that judgment be entered declaring them to be owners of a prescriptive easement in the farm road.

It is important to note that appellants could not have maintained such an action in 1850 since their asserted interest in the farm road is purely nonpossessory in nature and the statutory expansion of the quiet title doctrine had yet to occur.[10] (See 4 Pomeroy's Equity Jurisprudence (5th ed. 1941) § 1396, p. 1023 ["The equity jurisdiction to quiet title, independent of statute, was only invoked by a plaintiff in possession, holding legal title, when successive actions at law, all of which had failed, were brought against him by a single person out of possession, or when many persons asserted

---

[10]Thus respondent's attempt to categorize the quiet title action as one purely equitable in nature must fail.

equitable titles against a plaintiff in possession holding the legal or . . . . equitable title."]; Burby, Real Property (3d ed. 1965) § 23, p. 64 [easement is a nonpossessory interest in land]; former § 738 [originally codified in 1872]; *Thomson, supra,* 7 Cal.2d at p. 676 [former § 738 eliminated requirement of possession]; *Welsh* v. *County of Plumas* (1889) 80 Cal. 338 [22 P. 254] [a right of way is an interest in land covered by former § 738 so as to enable its owner to bring a quiet title action for its protection]; § 760.010 et seq. [current quiet title statute].)

Even though appellants could not have sustained a quiet title action in 1850, they would not have been without a remedy to enforce their prescriptive easement. Indeed, two remedies were available to those seeking to protect this type of incorporeal interest in real property.

They could seek equitable relief in the form of an injunction to prevent interference with their right of way. (E.g., *Gormley* v. *Clark* (1890) 134 U.S. 338 [33 L.Ed. 909, 10 S.Ct. 554]; *Danielson* v. *Sykes* (1910) 157 Cal. 686 [109 P. 87]; *Franz* v. *Mendonca* (1900) 131 Cal. 205 [63 P. 361]; *Stallard* v. *Cushing* (1888) 76 Cal. 472 [18 P. 427]; *Frahm, supra,* 12 Cal.App.3d at p. 445.) "Where the right to an easement is clear it need not be first established in an action at law, as a prerequisite to relief by injunction." (19 C.J., Easements, § 254, p. 993; accord, *Frahm, supra,* 12 Cal.App.3d at p. 445; 25 Am.Jur.2d, Easements and Licenses, § 121, p. 524.) " 'If, however, [as here, the] right to an easement is involved in substantial dispute, no injunction will be granted until the claim has been established at law.' " (*Frahm, supra,* 12 Cal.App.3d at p. 445, citing 25 Am.Jur.2d, Easements and Licenses, § 121, p. 524; see 28 C.J.S., Easements, § 107, p. 790; Note, 47 A.L.R. 552, 557.) This differentiation rests upon the rule that " 'under the English common law as it stood in 1850, at the time it was adopted as the rule of decision in this state, "if a plaintiff applies for an injunction to restrain the violation of a common-law right, if either the existence of the right or the fact of its violation be disputed, he must establish that right at law;" or, in other words by a jury, if one be demanded.' " (*Pacific Western Oil Co.* v. *Bern Oil Co., supra,* 13 Cal.2d at p. 68, citing *Farrell* v. *City of Ontario, supra,* 39 Cal.App. 351, 358; see 1 High on Injunctions (4th rev. ed. 1905), § 8, pp. 12-14; 29 Cyc. 1228.)

The proper remedy available to appellants "[a]t common law . . . was an action on the case." (*Frahm, supra,* 12 Cal.App.3d at p. 445; accord, 11 C. J., Action on the Case, §§ 16, 17, pp. 8-9.) "The right of trial by jury existed with respect to [this] common law remedy . . . and, consequently, such right exists in a civil action under modern practice which formerly would have fallen within that common law form of action." (*Frahm, supra,* 12 Cal.App.3d at p. 445, citing 47 Am.Jur.2d, Jury, § 39, p. 658.)

It can be seen then that, in either event, appellants would have been relegated to an action at law to *establish* their right to a prescriptive easement in the farm road. The right to trial by jury existed in actions at law in 1850 and thus continues to be guaranteed by our Constitution today.

Yet appellants were deprived of their constitutional right to have a jury decide whether they had obtained a prescriptive easement in the farm road. This " 'denial of a trial by jury to one constitutionally entitled thereto constitutes a miscarriage of justice and requires a reversal of the judgment.' " (*People* v. *One 1941 Chevrolet Coupe, supra*, 37 Cal.2d at p. 300.)

Therefore, the judgment of the superior court is reversed and the matter remanded for a new trial. In light of this holding, we need not address the parties' remaining contentions.

Thaxter, J., and Buckley, J., concurred.